# STATE OF OREGON,
*Respondent,*

*v.*

# JANDRA DEE REEVES,
*Appellant.*

## (94CR0042FE; CA A89544)

927 P2d 93

Steven V. Humber, Deputy Public Defender, argued the cause for appellant. With him on the brief was Sally L. Avera, Public Defender.

Rolf C. Moan, Assistant Attorney General, argued the cause for respondent. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before Riggs, Presiding Judge, and Landau and Leeson, Judges.

LEESON, J.

## LEESON, J.

After a jury trial, defendant was convicted of possession of a controlled substance. ORS 475.992. She assigns error to the trial court's denial of her motion to suppress evidence found between the mattress and box spring in her motel room by police officers who were executing a warrant. We affirm.

The facts are not in dispute. On the morning of January 7, 1994, officers Brown and Matthews and other members of the Douglas Interagency Narcotics Team went to a Sutherlin motel to arrest defendant for violating the conditions of her parole. They had a warrant that authorized a search of room 217 for defendant's person. The officers had information that a number of people had been coming and going from that room and they were prepared to find others in the room in addition to defendant. When they arrived at the motel, the manager gave one of the officers a key to room 217. The officers knocked on the door several times and announced that they had a warrant. There was no response from inside the room. After waiting for a minute or two, an officer tried to open the door with the key, but was unable to unlock it. As the other officers pounded on the door and yelled "Police, open the door," Brown ran back to the manager's office and got a master key. He returned to the room and tried that key, but it would not unlock the door either. The officers continued pounding on the door and yelling for the occupants to open it. After approximately 15 to 20 minutes, a man opened the door.

Brown recognized the man as Roy Weatherford, whom he knew had a history of acting violently when arrested. He testified that he considered Weatherford "to be a very real threat" to the officers who were executing the warrant. Matthews also was aware of Weatherford's history of assaultive behavior and arrests for violent acts and testified that Weatherford appeared "agitated" when he answered the door. Matthews testified that normally the most dangerous moment in executing a search warrant is at the time of entry. He also testified that he knew that defendant used methamphetamine and suspected that Weatherford did, too. Both

Brown and Matthews testified that in the past, when they had arrested people who used methamphetamine, those people tended to be paranoid and occasionally violent, and that it was not uncommon for them to have weapons.

As was their standard procedure, the officers entered room 217 with guns drawn and began to handcuff the occupants. Within less than a minute of the entry, an officer had ordered Weatherford to lie down on the floor and handcuffed him with his arms behind his back. At the same time, another officer approached defendant, who was lying on the bed, ordered her to stand up, and handcuffed her hands behind her back. Weatherford complained that an injury made it painful for him to have his hands handcuffed behind his back and asked if he could be handcuffed in front. Brown agreed, but said that doing so would make it necessary to search the area around Weatherford for weapons. Brown testified that the room was very small and that, with Weatherford's hands in front of him, Brown had increased concern for officer safety. Matthews also testified that he became more concerned about officer safety when Weatherford asked to have his hands moved to the front. At Brown's direction, Matthews did a "perimeter search" in the area around the bed, which included lifting the mattress. He discovered several items between it and the box spring, among them a hypodermic needle and a small black leather pouch.

Matthews testified that "the whole thing, the whole entry and securing the place didn't take very long." Brown testified that the entire process—entering the room, getting Weatherford down on the floor and handcuffing him, approaching defendant, standing her up and handcuffing her, searching for weapons, moving defendant to a chair by the table, moving Weatherford's handcuffs to the front and sitting him on the edge of the bed—took less than four minutes.

After defendant and Weatherford were handcuffed and seated, Brown left the room to call defendant's parole officer, while a police officer read defendant and Weatherford the search warrant. Defendant denied any knowledge of the items discovered under the mattress. The parole officer arrived and, on the basis of a "consent to search" clause that

was a condition of her parole, asked defendant's permission to search her purse, her car and the motel room. Defendant agreed, and the officers searched those areas. One of the officers opened the leather pouch and discovered several bindles containing methamphetamine. Defendant was arrested and charged with possession of a controlled substance.

Subsequently, the trial court denied defendant's motion to suppress the evidence discovered under the mattress. It found that the officers were "credible," that the delay in the officers' ability to enter the room "obviously * * * increased everyone's anxiety," and that Brown "was immediately concerned because the person who answered the door was Mr. Weatherford and he knew that Mr. Weatherford had a history of violent behavior and he was a very real threat to the police." It also found that Weatherford "appeared agitated" and that the officers "searched the perimeter to make sure there were no weapons in the area." The court concluded:

> "[I]n the process of initially having people either get down on the floor or getting cuffed and they were cuffed behind— their hands and wrists behind their back, in that process Mr. Weatherford himself complained of pain and discomfort and, obviously, they wanted to move Mr. Weatherford and resecure him by recuffing him in a different position. In order to do that, they made the search within that perimeter. So here it's clear that [defendant] herself was not exhibiting anything but cooperation but Mr. Weatherford himself was agitated and was making demands to be released and demands to have his cuffs changed. So in moving him around because of that agitated state, the Court finds that there is an issue of officer safety involved at this point."

On appeal, defendant contends that the trial court erred in denying her motion to suppress, because the officers' search of her room exceeded the scope of the warrant and was not authorized by any exception to the warrant requirement. Although the state concedes that "the search at issue was not authorized by the warrant," it contends that the trial court correctly denied defendant's motion, because the search was lawfully based on officer safety concerns.

■    The legality of a search and seizure depends largely on the facts in each case. *State v. Ehly*, 317 Or 66, 74, 854 P2d 421 (1993). We are bound by the trial court's findings of historical fact if they are supported by the record. Our role is to "decide whether the trial court applied legal principles correctly to those facts." *Id.* at 74-75. The question in this case is whether the trial court properly concluded that the officer safety exception to the warrant requirement justified the officers' search under the mattress when they acceded to Weatherford's request to have his hands handcuffed in front of him.

■    An officer may take reasonable steps for protection if, during a lawful encounter with a citizen, the officer develops a reasonable suspicion, based on specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or others. *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987). In *Bates*, the Supreme Court noted that

> "it is not our function to uncharitably second-guess an officer's judgment. A police officer in the field frequently must make life-or-death decisions in a matter of seconds. There may be little or no time in which to weigh the magnitude of a potential safety risk against the intrusiveness of protective measures. An officer must be allowed considerable latitude to take safety precautions in such situations." *Id.*

The inquiry on appeal is limited to "whether the precautions taken were reasonable under the circumstances as they reasonably appeared at the time that the decision was made." *Id.* at 524-25.

■    Defendant argues that "[t]he only reason offered for the 'officer safety' search in this case was the reputation of methamphetamine users as generally paranoid and generally sometimes violent maybe [*sic*]." She concedes that "Weatherford may have on some previous occasion fought," but contends that on this occasion he was quickly controlled and handcuffed, and "gave no indication to any of the officers of any danger."[1] The state responds that the officers based their suspicion that Weatherford might pose an immediate

---

[1] Defendant does not argue that it was inappropriate for the officers to place Weatherford on the bed while executing the warrant, nor does she contend that they safely could have positioned him somewhere else in the room.

threat to their safety on specific and articulable facts and that those facts were analogous to the facts that were found to create a reasonable belief that the defendant might pose an immediate threat in *Ehly*. We agree.

In *Ehly*, the police officers encountered the defendant in a motel room that the defendant had refused to vacate after failing to check out at the scheduled time. They knew that he had prior felony convictions and that he used methamphetamine. *Ehly*, 317 Or at 80. He "was very nervous, very anxious," *id.* at 70 n 2, and they knew that many people who use illegal narcotics possess guns. *Id.* at 80. When the officers asked the defendant to give the room key to the manager, the defendant began searching through a gym bag for it. One of the officers became concerned that there might be a gun in the bag and asked the defendant why he did not simply dump the contents on the bed and look for the key. The defendant did not respond to the officer's suggestion; instead, he continued to rummage through the bag with both hands concealed. At that point, the officer suspected that the defendant was searching for a gun and ordered him to dump the contents of the bag onto the bed. The Supreme Court concluded that those circumstances created a "reasonable suspicion" in the officer's minds that the defendant was "presently dangerous to them." *Id.* at 82. It held that,

> "when a police officer has reason to believe that a lawfully stopped individual is dangerous and may gain immediate control of a weapon, he may conduct a search of the area around the individual from which the individual could obtain a weapon." *Ehly*, 317 Or at 83 n 16 (quoting, with approval, 1 Rudstein, Erlinder and Thomas, *Criminal Constitutional Law* § 2.07[7] (1992)).

Here, when the officers encountered Weatherford in the small motel room, they knew that he had a record of previous arrests during which he behaved violently, they suspected that he was a methamphetamine user, he appeared "agitated," and they knew that it is not uncommon for methamphetamine users to carry weapons. They also knew that if his hands were handcuffed in front of him, Weatherford would have increased mobility. Weatherford had refused to answer the door or respond to the officers' demands to open the door, giving him between 15 to 20 minutes to hide a

weapon in the room, including under the mattress. Weatherford demanded that the officers handcuff him with his hands in front of him, contrary to their standard procedure. Because doing so gave Weatherford increased mobility, the officers were entitled to look for weapons in the area to which he would have access.

The trial court did not err in denying defendant's motion to suppress.

Affirmed.