Argued and submitted February 27, reversed and remanded July 23, 2008

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# SCOTT MICHAEL ZUMBRUM,
*Defendant-Appellant.*

Lane County Circuit Court
200508125; A131228

189 P3d 1235

David C. Degner, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Jeremy C. Rice, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Ortega, Judge, and Carson, Senior Judge.

ORTEGA, J.

## ORTEGA, J.

Following a stipulated facts trial, defendant was convicted of unlawful possession of a controlled substance. *Former* ORS 475.992 (2003), *renumbered as* ORS 475.840 (2005). On appeal, he assigns error to the trial court's denial of his motion to suppress a methamphetamine pipe that was seized following a warrantless search. We reverse and remand.

In reviewing a trial court's decision on a motion to suppress, we are bound by the trial court's factual findings if there is evidence in the record to support them. *State v. Hendricks*, 213 Or App 360, 362, 160 P3d 1014, *rev den*, 343 Or 467 (2007). When the trial court has made no findings, we presume that the court found the facts in a manner consistent with its ultimate conclusion. *Id.* We review legal conclusions for errors of law. *Id.*

The following facts are drawn from the testimony of Officer Hart, who was the sole witness at the suppression hearing. Officers Hart and Henry were dispatched to aid Rauch, a probation officer, in arresting Bryce for a probation violation. Hart, who had had prior dealings with Bryce, knew her to be involved with persons who participated in "mid- to upper-level drug deals." The officers received a tip that Bryce could be found at defendant's mother's apartment, which was located in what Hart described as a "high-crime area" of Eugene. Hart was familiar with defendant's mother's apartment building because it was the subject of tips about illegal drug activity, including methamphetamine labs. The officers also learned that defendant was on post-prison supervision and was staying at his mother's apartment. They did not know the basis of defendant's prior conviction.

The officers arrived at the apartment at approximately 4:30 p.m. Each carried a sidearm. Hart wore a uniform; Henry and Rauch were dressed in plain clothes. Defendant's mother told the officers that Bryce was asleep in the back bedroom and allowed them to enter the apartment. Henry remained with defendant's mother in the living room; Hart and Rauch went into the back bedroom. They found Bryce naked and asleep on the bed, while defendant, who was

wearing only shorts, slept on the floor. Hart waited in the hallway as Rauch woke defendant and asked him to leave the bedroom. As defendant entered the hallway, Hart observed that defendant seemed "nervous, more so than * * * a regular contact would have been." Hart asked defendant to submit to a patdown. Defendant complied, and the search revealed a cylindrical object; Hart initially believed it was a knife, but, on closer examination, it turned out to be a methamphetamine pipe. Hart was able to retrieve the pipe from defendant's shorts "very easily."

At the hearing on the motion to suppress, Hart testified that his encounter with defendant was "quick" and that his decision to perform a patdown was based on "the neighborhood" and on Rauch's information that Bryce and defendant were both on supervision. Hart wanted "to make sure that people coming out of [the bedroom] didn't have weapons on them" because, in his experience, "90 to 95 percent" of methamphetamine-related contacts yielded a readily usable pocketknife. Hart stated that the risk was particularly high with persons who are involved in mid- to upper-level drug deals, because they often carry weapons to protect their assets. Although the officers were not outnumbered, Hart was also concerned about being involved in a fight. He explained that, although he was taller and heavier than defendant,[1] he had previously been in fights with "scrappy guys" and that a person's size does not indicate his fighting ability. Hart was also concerned because Bryce was a "large person" and, had a fight occurred, the officers "would have been really strapped." At the time of the patdown, Hart did not suspect that defendant was under the influence of methamphetamine, did not suspect that defendant possessed any illegal substances, and was not investigating defendant on a drug-related offense.

On appeal, defendant contends, as he did at the suppression hearing, that the warrantless search was not justified by officer safety concerns because Hart lacked any particularized concerns about defendant. The state responds

---

[1] Hart was six feet, two inches tall, and weighed 220 pounds. Defendant was five feet, nine inches tall, and weighed 160 pounds.

that, in light of the above circumstances, defendant's "abnormally nervous demeanor" in the confines of a narrow hallway rendered Hart's belief that defendant posed a threat of serious physical harm reasonable.

Article I, section 9, of the Oregon Constitution provides, in part:

> "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

Article I, section 9, does not prevent an officer from taking reasonable steps to protect himself or others if, during a lawful encounter with a citizen, the officer develops "a reasonable suspicion, *based on specific and articulable facts*, that the citizen may pose an immediate threat of serious physical injury to the officer[.]" *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987) (emphasis added). When the police conduct a warrantless search, the burden is on the state to establish its validity. ORS 133.693(4); *State v. Tucker*, 330 Or 85, 89, 997 P2d 182 (2000). Accordingly, the state must establish that the officer subjectively believed that a defendant posed an immediate threat of serious physical injury and that the officer's belief was objectively reasonable. *Bates*, 304 Or at 524-25. Here, the officer testified that he was concerned for his safety when he asked defendant to submit to a patdown. As a result, the only issue before us is the objective reasonableness of the officer's concern.

That examination is based on "the totality of the circumstances as they reasonably appeared to the officer[ ] at the time of the patdown." *State v. Jackson*, 190 Or App 194, 199, 78 P3d 584 (2003), *rev den*, 337 Or 182 (2004). Although we are mindful that we should not "uncharitably second-guess" the split-second decisions of officers who often work under dangerous, potentially deadly circumstances and must be allowed considerable latitude to take safety precautions, *Bates*, 304 Or at 524, intuition and generalized fear do not constitute reasonable suspicion of an immediate threat that will justify a warrantless search, *State v. Reinhardt*, 140 Or App 557, 562, 916 P2d 313 (1996), *rev dismissed*, 327 Or 521 (1998). Rather, there must be specific and articulable facts to

justify the officer's conclusion that a particular person presents an immediate threat of harm. *State v. Cocke,* 161 Or App 179, 193, 984 P3d 321 (1999), *rev'd on other grounds,* 334 Or 1, 45 P3d 109 (2002). Our inquiry into "reasonableness" requires consideration of the nature and extent of the perceived danger and the degree of intrusion resulting from the officer's conduct. *State v. Rickard,* 150 Or App 517, 526, 947 P2d 215, *rev den,* 326 Or 234 (1997).

As we have observed in the context of other officer-safety cases, fact-matching "can be a fool's errand." *State v. Senn,* 145 Or App 538, 545, 930 P2d 874 (1996). Nevertheless, *State v. Reeves,* 144 Or App 305, 927 P2d 93 (1996), *rev den,* 324 Or 513 (1997), serves as a helpful starting point for our analysis. In that case, the police went to a motel to arrest the defendant for violating the conditions of her parole. The officers were prepared to find others in the room along with the defendant. The officers attempted to gain entry into the room for 15 to 20 minutes, alternately knocking at the door and announcing they had a warrant, and unsuccessfully using keys to the room provided by the motel's manager. A man, who appeared to be "agitated," finally opened the door. One officer recognized the man and knew him to have a history of acting violently when arrested. Another officer was aware of the man's history of assaultive behavior and arrests for violent acts. That officer also knew that the defendant used methamphetamine and suspected that her male companion did as well. *Id.* at 307. Both officers testified that, when they had previously arrested people for methamphetamine use, those people tended to be paranoid and violent, and commonly had weapons. *Id.* at 308.

The officers quickly subdued the room's occupants. The defendant's male companion complained of an injury that would make it painful for him to have his hands handcuffed behind his back and asked that he be handcuffed in front. The officers agreed, but searched the area around the man because his request increased their concern for their safety. Because the motel room was "very small," they also did a "perimeter search" around the bed, which included lifting the mattress. The search revealed drug paraphernalia hidden between the mattress and the box spring. *Id.* The defendant sought to suppress that evidence, arguing, among

other things, that it was not authorized by any exception to the warrant requirement. *Id*. at 309. Noting the lengthy interval before the officers were able to gain entry to the room and the man's request that his hands be handcuffed in front, we concluded that the search was authorized by officer safety concerns because, when the officers encountered the man in the motel room, they were aware of previous arrests during which he behaved violently, they suspected he was a methamphetamine user, he appeared "agitated," and they knew that it was not uncommon for methamphetamine users to carry weapons. *Id*. at 311-12.

*State v. Peterson*, 143 Or App 505, 923 P2d 1340 (1996), illustrates a circumstance where we drew the opposite conclusion. In that case, an officer stopped the defendant after he committed a traffic infraction. As the officer approached the vehicle, he noticed that the defendant was "moving around a great deal" and that most of the movement was directed at the front passenger seat. *Id*. at 507. The defendant was cooperative and responded to the officer's questions. Nevertheless, the defendant was nervous and his eyes were darting toward a jacket on the front passenger seat. *Id*. After questioning the defendant, the officer ultimately asked him to get out of the car and submit to a patdown search. Defendant complied, and the search revealed drugs. *Id*. at 508. We concluded that those circumstances did not present an immediate threat of serious physical injury. We noted that no weapons were visible, that the defendant had not made any movements toward the jacket in the officer's presence, and that there was nothing in his behavior that suggested that he was hostile to the officer. *Id*. at 510-11; *see also State v. Blevins*, 142 Or App 237, 245, 920 P2d 1131 (1996), *rev den*, 327 Or 521 (1998) (nervous behavior and a refusal to comply with an officer's request to keep hands visible justified a patdown for officer safety purposes).

This case is less like *Reeves* and more like *Peterson*; after considering the totality of the circumstances, we reject the state's contention that Hart's patdown of defendant was justified by officer safety concerns. Although, under the circumstances, defendant's nervousness may have caused Hart concern, we cannot conclude that any particularized conduct by defendant suggested that he presented an immediate

threat of serious physical injury. Indeed, there are several facts that detract from a reasonable belief that defendant's nervousness indicated the possibility of a physical danger to Hart. Defendant had just been awakened in his mother's home by a police officer wearing a sidearm and had been asked to leave the room. Defendant complied. On entering the hallway, he immediately encountered another officer, who was not only physically imposing, but who also carried a sidearm. We consider those circumstances as part of the overall circumstances in determining the reasonableness of the officer's belief. *See, e.g., State v. Miglavs*, 186 Or App 420, 429-30, 63 P3d 1202 (2003), *aff'd*, 337 Or 1, 90 P3d 607 (2004).

As in *Peterson*, there is no evidence that defendant was hostile to the officers. He immediately complied with Rauch's request to leave the bedroom. There likewise is no evidence that defendant, who wore only shorts, hid his hands or made any motion toward the pocket from which Hart ultimately retrieved the methamphetamine pipe. Furthermore, in contrast to the officers' knowledge regarding the prior history of the defendant's male companion in *Reeves*, here, although Hart knew that defendant was on post-prison supervision, he did not know the basis for defendant's prior conviction, nor was he otherwise aware of whether defendant had a history of violent behavior.

At the time that he asked defendant to submit to a patdown, Hart did not suspect that defendant was under the influence of methamphetamine and was not investigating him for any drug-related offense. Although Hart based his safety concerns in large part on his past experience with methamphetamine-related contacts, the only possible bases for any belief that defendant was involved with methamphetamine was his association with Bryce and the character of the neighborhood. The mere fact that a person associates with another person involved with methamphetamine does not support a reasonable suspicion that that person is also involved with methamphetamine. *See State v. Manss*, 99 Or App 498, 502, 783 P2d 24 (1989) (where a suspect attempted a drug sale and later joined a group of people that included the defendant, an officer could not reasonably suspect that the defendant had committed a crime). The high incidence of

crime in the neighborhood is likewise irrelevant. *Bates* cautions that "[n]either the [late] hour nor the 'high crime' nature of the area tells us whether *this* defendant is likely to be a criminal[.]" 304 Or at 526. Here, the high incidence of crime in the neighborhood in general, and methamphetamine production in the apartment building in particular, does not tell us whether defendant, who had been asleep in the late afternoon hours in his mother's apartment, was involved in criminal activity.

Reversed and remanded.