Argued and submitted February 9, 2016, reversed and remanded
August 16, 2017

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## RUSSELL MARTIN REICH,
*Defendant-Appellant.*

Deschutes County Circuit Court
13FE0613; A156698

403 P3d 448

Kyle Krohn, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Dustin Buehler, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Paul L. Smith, Deputy Solicitor General.

Before Tookey, Presiding Judge, and Egan, Judge, and Sercombe, Senior Judge.

**SERCOMBE, S. J.**

Defendant appeals a judgment of conviction for unlawful possession of methamphetamine, ORS 475.894, entered after a conditional guilty plea. Defendant assigns error to the trial court's denial of his motion to suppress evidence discovered following a traffic stop. He contends that the traffic stop was extended by a request to search his person and that the extension was unlawful because it did not occur during an "unavoidable lull" in the investigation of the traffic violation, nor was it justified by reasonable suspicion of criminal conduct. We agree with defendant's contentions and, therefore, reverse and remand.

Defendant was indicted on one count of unlawful possession of methamphetamine, ORS 475.894. Before trial, defendant filed a motion to suppress the evidence found on his person and all statements he made during and after the search of his person. After an evidentiary hearing, the trial court denied the motion. In reviewing that determination for legal error, we are bound by the trial court's factual findings if there is constitutionally sufficient evidence in the record to support them. *State v. Maciel-Figueroa*, 361 Or 163, 165-66, 389 P3d 1121 (2017). "When the trial court did not make express findings and there is evidence from which the trial court could have found a fact in more than one way, we will presume that the trial court decided the facts consistently with the trial court's ultimate conclusion." *Id.* at 166. We state the facts in accordance with those standards.

Officers Emerson and Smith were on patrol together. Emerson saw a pickup truck that he recognized from a previous stop in which he had arrested the owner, Curtis, for possession of methamphetamine. Emerson knew that Curtis had a suspended driver's license. Smith noticed that the pickup was speeding, and the officers initiated a traffic stop.

Emerson approached the passenger side window of the pickup; Curtis was in the passenger seat. Smith approached the driver side window and spoke to defendant, who was the driver. Defendant was cooperative. He admitted that he was speeding and provided his driver's license. Smith asked for the vehicle's registration and insurance

information, to which Curtis replied that the pickup was his, and began looking for the documents. Curtis handed Smith the registration, which showed that he was the registered owner, and he continued to look in the glove box for the insurance information. Emerson testified that he always asks for license, registration, and proof of insurance for every traffic stop and agreed that gathering insurance information is part of "routine traffic ticket processing."

While Curtis was looking for proof of insurance, Smith asked defendant whether there was anything illegal in the pickup. Defendant became nervous, looked away, acted like he did not hear the question, and did not respond. Defendant went from making eye contact with Smith to almost solely staring at the glove compartment that Curtis was looking through. Smith asked defendant a second time, and he did not respond. Smith continued to ask the question, and defendant eventually said that the pickup did not belong to him and indicated that Smith should ask Curtis.

Emerson testified that defendant's "demeanor changed immediately" and "drastically" after Smith asked whether there was anything illegal in the vehicle. He stated:

"[Smith] asked him a second time if there was anything illegal in the vehicle, and he again didn't respond. And it was very clear he could understand what she was asking. So, for me, * * * watching that and with a substantial experience in, in drug detection, I know that people's response to that question can be very telling.

"So even though he wasn't saying anything, it seemed like a very clear statement to me from where I was at that, that there was, in fact, something illegal in the vehicle because the, the demeanor change was so drastic from what it had been. So for me it was very alarming, it was very alerting. With my experience, I, it was clear to me that there was something in that vehicle."

Smith then asked Curtis, who was still looking for proof of insurance, for his consent to search the pickup, and Curtis consented. Without being asked to, defendant and Curtis stepped out of the vehicle. Curtis had not yet provided proof of insurance at the time that he and defendant got out of the vehicle. Emerson did not recall Smith or

himself offering Curtis a chance to continue to look for the insurance once he had stepped out of the vehicle. Emerson testified that, at the point when the men got out of the pickup, "because of * * * the reaction that [defendant] had to the questioning, [he] was pretty confident [defendant] had something in his possession."

On cross-examination, Emerson stated the following:

"Q    At the time that [defendant] and Mr. Curtis stepped out of the vehicle, at that point there had been no evidence of a crime other than a speeding ticket?

"A    Evidence, there was, I would say I had reasonable suspicion at that time, but we didn't have any evidence in our hand if that's what you're asking.

"* * * * *

"Q    And when you say 'evidence,' are you, are you referring to [defendant's], I guess, evasive behavior?

"A    Yeah. So I, I believed there was, I believed there was methamphetamine on him or in the vehicle when they stepped out of the vehicle. I was convinced of it. And the reason why is 'cause of my past experience with that particular vehicle where I had actually taken methamphetamine out of that particular vehicle. I knew that Mr. Curtis was a methamphetamine user.

"And the quick change in demeanor when we asked if something illegal, and that nervousness, the, pretend that they, he couldn't under or couldn't hear the question, all those things went into me believing that."

Once defendant and Curtis were out of the pickup, Smith approached them and asked if she could search their persons before she searched the vehicle.[1] In response to Smith's request for consent, defendant put his arms out to the side, indicating his consent. Defendant then dropped his arms quickly, let out a sigh, and said that Smith could search

---

[1] Emerson testified that it is police protocol that, "when someone consents to a search of the vehicle * * * it's perhaps the most vulnerable position an officer can be in because they * * * now have their back to the occupants * * * so we train our officers to ask for consent to search the person as well or a pat-down so they know, when they're digging in that car, that they don't have access to a weapon. * * * [Smith] was asking in accordance to how I had trained her in the past."

him, but that "he did have a pipe on him." Smith searched defendant and found methamphetamine, a methamphetamine pipe, and various drug paraphernalia. Smith seized those items, and then advised defendant of his *Miranda* rights and asked him some questions about the methamphetamine. Defendant admitted that he had used methamphetamine and that the pipe belonged to him. He further consented to performing field sobriety tests, which indicated that, to the extent that he had used methamphetamine, it had not impaired his driving. Accordingly, the officers determined that they would not arrest him for driving under the influence. Smith issued defendant a citation for possession of methamphetamine and then he was released.[2]

Emerson testified that, generally speaking, a person who is stopped for speeding is not free to leave until the officer has either issued a warning or written a citation. And further, that Smith had not returned to the patrol vehicle between the initial contact and the discovery of methamphetamine, and defendant's information had not been run "through Dispatch" to confirm he had a valid driver's license prior to the search of his person.

In support of his motion to suppress, defendant argued to the trial court that the stop was unlawfully extended in violation of Article I, section 9, of the Oregon Constitution[3] after the men got out of the car and Smith asked defendant for consent to search his person. Defendant neither disputed that the initial traffic stop was legal, nor disputed the legality of Smith's request to search the pickup. The state argued in response that the questioning by the officer, including the requests for consent to search, took place during an unavoidable lull in the traffic stop and was, therefore, lawful. The state's written response to defendant's motion also asserted, as an alternative justification, that the police had reasonable suspicion of criminal activity to justify any extension of the traffic stop.

---

[2] At some point after the officers finished searching the pickup, Curtis got back into the vehicle and was eventually able to find proof of insurance for the police officers.

[3] Article I, section 9, of the Oregon Constitution provides, in part, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

The trial court indicated that the facts—as testified to by Emerson—were not sufficient to support the state's reasonable suspicion theory:

"I don't think the Court of Appeals would want me to consider [reasonable suspicion], based upon the testimony. This is something that comes up often based upon—I don't doubt Corporal Emerson's observations. I simply believe that the current state of the law is that that would be insufficient for this Court to consider.

"It may work well in the field, but I've dealt with that a few times. And unless there's been a change, I, I think the State's stronger argument has to do with * * * the lull."

The court took the motion under advisement, and denied it in a letter opinion:

"Defendant's Motion to Suppress is denied. The court finds that the officer's request to search the vehicle driven by the defendant occurred during an unavoidable lull, to-wit: while the passenger searched for an insurance document. Consent to search the vehicle was voluntarily given and both defendant/driver and passenger got out of the vehicle without prompting by law enforcement. The court further finds that defendant voluntarily consented to a search of his person prior to the vehicle search, and he made statements without being questioned by police, statements that are not subject to *Miranda*."

Defendant conditionally pleaded guilty, and the court entered a judgment of conviction for unlawful possession of methamphetamine.

On appeal, the parties renew the arguments that they made in the trial court. We summarized the applicable legal principles in *State v. Kimmons*, 271 Or App 592, 600-01, 352 P3d 68 (2015):

"'Seizures or searches for evidence to be used in a criminal prosecution, conducted without a warrant or without an exception to the warrant requirement, violate Article I, section 9[.]' *[State v.] Rodgers/Kirkeby*, 347 Or [610, 623, 227 P3d 695 (2010)]. A temporary restraint of a person's liberty for the purpose of criminal investigation—*viz.*, a stop—qualifies as a seizure, and, therefore, must be justified by a reasonable suspicion of criminal

activity. For that reason, police may not unreasonably delay, or extend the duration, of an otherwise lawful stop to investigate unrelated matters for which they lack reasonable suspicion, [*id.*] at 621-24, but investigations into unrelated matters that occur during an 'unavoidable lull' are permissible."

(Some citations omitted.) During a traffic stop, if "officers extend the encounter by beginning to investigate another crime, Article I, section 9, requires that they have reasonable suspicion that the motorist has committed, is committing, or is about to commit that crime." *State v. Westcott*, 282 Or App 614, 618, 385 P3d 1268 (2016), *rev den*, 361 Or 486 (2017).

As noted, the parties do not dispute that the initial stop, based on a traffic violation, was legal. The only questions before us are whether the request to search defendant's person was justified by the officers' reasonable suspicion that a crime had been committed, and if not, whether it took place during an "unavoidable lull" in the traffic stop. We begin with the reasonable suspicion inquiry.

In *Maciel-Figueroa*, the Supreme Court clarified the standard for "reasonable suspicion" that is required to support the lawfulness of an investigative stop of a person:

"For police officers to make a stop, they must reasonably suspect—based on specific and articulable facts—that the person committed a specific crime or type of crime or was about to commit a specific crime or type of crime. For a court to determine that an investigative stop was lawful under Article I, section 9, the court (1) must find that the officers actually suspected that the stopped person had committed a specific crime or type of crime, or was about to commit a specific crime or type of crime, and (2) must conclude, based on the record, that the officers' subjective belief—their suspicion—was objectively reasonable under the totality of the circumstances existing at the time of the stop."

361 Or at 182.

The state contends that the police officers' suspicion that defendant possessed a controlled substance was based on defendant's nervousness, the drastic change in

defendant's demeanor when he was asked whether there was anything illegal in the vehicle, and Curtis's prior possession of methamphetamine. When viewed as a whole, according to the state, the officers' various observations established reasonable suspicion that defendant possessed methamphetamine—in other words, their subjective belief was objectively reasonable under the totality of the circumstances.

Defendant asserts that the state did not establish reasonable suspicion of a crime, and argues that nervousness and association with a person who has possessed methamphetamine in the past are not enough to establish reasonable suspicion. Defendant relies on *State v. Maciel*, 254 Or App 530, 540 n 4, 295 P3d 145 (2013) (noting that a driver's change in demeanor could be ascribed to "the sudden realization that a mere traffic stop is escalating into a criminal investigation" and, therefore, according it "little weight") and *State v. Zumbrum*, 221 Or App 362, 369, 189 P3d 1235 (2008) ("The mere fact that a person associates with another person involved with methamphetamine does not support a reasonable suspicion that that person is also involved with methamphetamine.").

The first two circumstances the state points to in supporting its position—nervousness and demeanor change—are intertwined: defendant had been cooperative and making eye contact with Smith until she asked whether there was anything illegal in the vehicle. At that point, defendant became nervous; he stopped making eye contact, stared at the glove box, and avoided answering Smith's question that she posed a number of times. We have repeatedly stated that nervous behavior adds little to the reasonable suspicion inquiry. *State v. Dawson*, 282 Or App 335, 342, 386 P3d 165 (2016); *see, e.g., State v. Bray*, 281 Or App 435, 447, 380 P3d 1245 (2016) (explaining that "'nervousness alone is entitled to little weight when evaluating reasonable suspicion'") (quoting *State v. Huffman*, 274 Or App 308, 314, 360 P3d 707 (2015), *rev den*, 358 Or 550 (2016)); *State v. Alvarado*, 257 Or App 612, 629, 307 P3d 540 (2013) (concluding that "defendant's anxious behaviors contribute very little to our reasonable suspicion calculus").

As to the state's reliance on the fact that defendant was with Curtis, who had possessed methamphetamine in the past, that fact alone does not support a reasonable suspicion that defendant possessed methamphetamine. We have previously recognized that association with a person involved with methamphetamine does not support a reasonable suspicion that a defendant is under the influence of methamphetamine, *State v. Easton*, 264 Or App 339, 343, 332 P3d 315 (2014), or involved with methamphetamine, *Zumbrum*, 221 Or App at 369.

Considering whether the officers' belief that defendant possessed a controlled substance was "objectively reasonable under the totality of the circumstances existing at the time of the stop," we conclude that it was not. *Maciel-Figueroa*, 361 Or at 182. The fact that defendant became nervous and unresponsive when asked if there was anything illegal in the pickup—a vehicle he was driving, but did not own—combined with the fact that the owner of the vehicle, who was the passenger, had previously been arrested for possession of methamphetamine, does not support an objectively reasonable suspicion that defendant possessed methamphetamine on his person and does not justify a warrantless pat-down. Viewing the totality of the circumstances, something more is needed before defendant's nervousness in such company amounts to reasonable suspicion. For example in *State v. Holdorf*, 355 Or 812, 829-30, 333 P3d 982 (2014), a stop was justified by reasonable suspicion when the defendant was nervous, avoided eye contact, was a passenger in an SUV whose driver was a known felon with an outstanding warrant who was under investigation as a suspect in a local methamphetamine distribution ring, and appeared to be "tweaking" and exhibiting the appearance of methamphetamine use.

Because Smith did not have reasonable suspicion to search defendant, whether her request to search him was lawful depends on whether the request was made during an unavoidable lull in the traffic stop. "Under the unavoidable lull rule, whether an officer's inquiry about a matter unrelated to the reasons for a traffic stop unlawfully extends the stop depends on whether the officer makes the inquiry instead of expeditiously proceeding with the steps necessary

to complete the stop." *State v. Nims*, 248 Or App 708, 713, 274 P3d 235, *rev den*, 352 Or 378 (2012). An officer is permitted to ask about unrelated matters if the officer is not in a position to proceed with the traffic violation investigation, such as waiting for a driver to provide identification, "but an officer may not inquire about unrelated matters as an alternative to going forward with the next step in processing the traffic violation, such as the writing or issuing of a citation." *Id.* (internal quotation marks, brackets, and emphasis omitted).

Defendant contends that the state failed to prove that the request for his consent to a search of his person occurred during an unavoidable lull. Defendant argues that, at the point in time when Smith requested his consent, the officers needed two more pieces of information to complete the traffic investigation: they needed to verify that defendant's license was valid, and they needed Curtis to provide insurance information. According to defendant, while Curtis was looking for his insurance information, there was an unavoidable lull in the traffic stop; however, once Curtis gave consent to search the pickup and he and defendant stepped out of the vehicle, the officers were no longer waiting for Curtis to provide proof of insurance, and the lull ended. In addition, defendant argues that the officers could have created a new unavoidable lull by sending defendant's license information to dispatch for verification or looking for the insurance information themselves, but instead of proceeding with investigation of the traffic violation, they chose to investigate whether defendant possessed illegal substances.

The state makes two arguments in response. First, the state asserts that defendant's consent to search his person occurred during an unavoidable lull because the request took place during the time when the officers were waiting for Curtis to provide the insurance information they needed to complete the traffic stop, and the lull continued because the officers were not in a position to proceed with the traffic investigation until they had that information. Second, the state argues that the trial court reasonably concluded that the officers did nothing to extend the traffic stop. The trial court explicitly found that defendant and Curtis "got out

of the vehicle without prompting by law enforcement" and, therefore, according to the state, the extended duration of the stop was attributable to the voluntary actions of defendant and Curtis, not to the officers. The officers did not tell Curtis to stop looking for the insurance information; he did so on his own volition. And when defendant consented to the search of his person moments later, the officers were still waiting for Curtis to provide his insurance card. Thus, the state argues, the consent was obtained during an unavoidable lull.

We agree with defendant that Smith's request to search defendant's person did not take place during an unavoidable lull in the traffic stop. Smith had collected defendant's driver's license and the vehicle registration, and she was waiting for Curtis to provide insurance information at the time she requested consent to search the vehicle. At that point, Curtis stopped looking for the insurance documentation and both men stepped out of the pickup. Smith or Emerson could have expeditiously proceeded with the traffic stop investigation by asking Curtis to continue looking for the insurance, by looking for the insurance information themselves, or by running defendant's information through dispatch. Instead, the officers switched their focus to investigate an unrelated matter—the crime of possession of a controlled substance—"as an alternative to going forward with the next step in processing the traffic violation." *Nims*, 248 Or App at 713 (brackets omitted).

Further, the state's argument that the unavoidable lull continued because defendant and Curtis voluntarily got out of the pickup is without merit. Although it is an undisputed fact that the officers did not ask defendant and Curtis to get out of the pickup, the officers had control over which investigation to pursue, and they chose to shift their investigation to the drug crime instead of pursuing the traffic violation. The resulting lull in the traffic violation investigation was entirely avoidable.

The state failed to prove that Smith's request for consent to search defendant's person was justified by reasonable suspicion or occurred during an unavoidable lull. Therefore, the request was an unlawful extension of the

traffic stop, and the trial court should have granted defendant's motion to suppress.

Reversed and remanded.