Argued and submitted September 24, reversed and remanded
December 16, 2020

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JENNIFER JEAN TAYLOR,
*Defendant-Appellant.*

Lane County Circuit Court
18CR35986; A169343

479 P3d 620

Defendant appeals from a judgment of conviction for felon in possession of a firearm, ORS 166.270(1). She assigns error to the trial court's denial of her motion to suppress evidence obtained during a traffic stop after the officer diverted from his traffic-infraction investigation to investigate whether defendant possessed controlled substances. Specifically, defendant argues that the officer's extension of the stop and shift to a drug investigation violated Article I, section 9, of the Oregon Constitution because that investigation was not supported by reasonable suspicion of drug activity. The trial court listed four facts in support of its conclusion that the officer had an objectively reasonable suspicion that defendant was committing the crime of drug possession: (1) defendant was carrying a roll of cash; (2) defendant was staying at and had just left a motel associated with drug activity; (3) defendant was extremely nervous; and (4) the stop occurred at midnight. *Held*: The trial court erred in denying defendant's suppression motion. The facts that the officer articulated were insufficient individually and collectively to establish reasonable suspicion of drug activity.

Reversed and remanded.

Maurice K. Merten, Judge.

Kali Montague, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Daniel Norris, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Shorr, Judge, and Powers, Judge.

SHORR, J.

Reversed and remanded.

**SHORR, J.**

Defendant appeals from a judgment of conviction for felon in possession of a firearm (FIP), ORS 166.270(1). She assigns error to the trial court's denial of her motion to suppress evidence obtained during a traffic stop after an officer diverted from his traffic-infraction investigation to investigate whether defendant possessed controlled substances. Specifically, she argues that the officer's extension of the stop and shift to a drug investigation violated Article I, section 9, of the Oregon Constitution because that investigation was not supported by reasonable suspicion of drug activity. We conclude that the court erred in denying defendant's suppression motion. Accordingly, we reverse and remand.

We review the trial court's ruling denying defendant's motion to suppress for legal error. *State v. Maciel-Figueroa*, 361 Or 163, 165-66, 389 P3d 1121 (2017). We are bound by the court's explicit and implicit factual findings if there is constitutionally sufficient evidence in the record to support them. *Id*. We summarize the facts in accordance with those standards.

On May 18, 2018, at around midnight, Officer Bazer was patrolling the Gateway area of Springfield. Bazer testified that, at that time of night, many businesses in the area were closed and that the area was "known for high drug activity." He noticed a four-door silver Mercedes pass him in the opposite direction and saw the car's brake lights come on as it approached a green light, which Bazer believed was "odd behavior." About 10 minutes earlier, a call had come in over the radio that a four-door silver Mercedes was wanted in connection with a shooting. For those reasons, Bazer "turned around and followed the vehicle," but did not turn on his overhead lights. After following the Mercedes for "[a] few blocks," the Mercedes came to a stop at a red traffic light but "stopped past the white line for the crosswalk" with its front tires "just past the white line." Bazer testified that he initiated a traffic stop because he believed he had "[probable cause] to stop the vehicle for failure to obey [a] traffic control device."

Bazer approached the driver, defendant, and asked her for her license, registration, and proof of insurance.

Bazer noticed that defendant's hands were shaking as she handed over her identification card and took this as a sign that she was nervous. Bazer testified that her level of nervousness was "more pronounced than what I regularly see on a normal traffic stop." Bazer characterized this as a possible "red flag," and testified that "it's not uncommon for people to be nervous with law enforcement, but in this case, it seemed like maybe it was a little bit more than just the nervousness of getting a ticket or something." Bazer testified that, as defendant handed him her identification, he "noticed what appeared to be a large amount of US currency *** rolled up in *** a center pocket" of her wallet. When asked what he believed the significance of that was, Bazer testified that

> "[i]t, it, all it means is it may be, I mean, who knows. Maybe she sold a car or something. But at the same time, it could be used for selling or being used to buy drugs. *** [I]t's frequently, you know, cash can be used for that and, and it's frequently used in smaller bills."

Bazer did not see the denominations of the bills, and did not provide any further description of the roll. When asked why drug sales were usually conducted in cash, Bazer answered that "[i]t's usually what everyone has. It's easy to get ahold of."

Next, Bazer noted that the passenger "seemed extremely tired. Droopy eyes. His movements were slow." Bazer interpreted these as "signs of impairment" and noted that he did not smell any alcohol. Bazer testified that his "contact with [the passenger] was fairly brief."

Defendant told Bazer that she had been given the car "last Christmas" and that she "hadn't registered it in her name yet" but that she "had paperwork from the owner." Bazer testified that it was "odd" for someone to "have a car for that long without registering it," and said that he had "had people tell me that they've loaned their cars out for people that will move substance for them. Substance being illegal narcotic." Defendant told Bazer that she was "staying at the Crosslands and she was driving [the passenger] home from visiting with her." The Crosslands was a motel a "few blocks" away that Bazer testified had "cheaper rooms" and

was an area of "frequent drug activity." Specifically, Bazer testified that the Crosslands Motel was one of two motels in the area that he knew to be "used a lot [by drug] dealers to deliver out of." Still, Bazer acknowledged that a person could be innocently "just staying at the hotel." Subsequently, Bazer returned to his vehicle. In total, Bazer's interaction with defendant at her car took approximately four or five minutes.

Bazer ran defendant's name and did not discover any warrants. At that point in time, however, Bazer suspected that defendant was in possession of narcotics. That suspicion was based on the time of night, defendant's nervousness, the cash in her purse, the passenger's possibly intoxicated condition, defendant's association with the Crosslands Motel, and her story about the unregistered vehicle. Bazer then called Officer Sorby, the officer who worked with the department's drug detection dog, and requested that he report to the scene. Bazer testified that he believed he was conducting a drug investigation at this point. Sorby also testified that he assumed he was being summoned for a drug investigation, even though he had not been told that specifically.

After summoning Sorby, Bazer returned to defendant's car, where defendant was still searching for vehicle paperwork. Bazer "started explaining to her all the things [he] was seeing. You know, with the money, the time of night. You know, where she was coming from. The location she was in." Bazer asked defendant what she had in the vehicle. Sorby arrived at the scene during that conversation and walked around the car to stand by Bazer. While the two did not speak, Sorby assumed from the circumstances that a drug investigation was underway. Sorby asked defendant if there was anything illegal in the car, and "informed her that he was most likely going to be getting his drug detection dog out and walking it around the car." Sorby told defendant, "[i]f there's anything you want to tell me about now, let me know." Defendant then reported that she had a "dirty needle" in her purse. The officers searched defendant's car and discovered heroin and meth residue as well as a handgun.[1] Because defendant had a previous felony conviction, she was charged with FIP.

---

[1] The state did not charge defendant with any drug crimes.

Before trial, defendant moved to suppress "the seizure of a controlled substance, paraphernalia, and a handgun and any and all derivative evidence, including any and all oral derivative evidence." Defendant argued that Bazer did not have reasonable suspicion that defendant possessed a controlled substance to extend the stop beyond its initial focus on the traffic infraction. The state argued that Bazer had reasonable suspicion for the extension of the stop, and that six specific facts supported that conclusion: defendant's extreme nervousness; the large amount of cash she was carrying; her sleepy and possibly intoxicated passenger; defendant's lack of registration and odd explanation for the lack of registration; the fact that defendant was staying at the Crosslands Motel and reported that she had just left there; and the late hour of night. Bazer and Sorby both testified at the hearing on the motion.

The trial court concluded that the stop was extended when Bazer began confronting defendant with his observations and questioning her about possible drug possession.[2] The court assigned little value to the intoxicated passenger and the missing registration but concluded that the remaining four factors, "[i]n totality," established objectively reasonable suspicion of drug activity. After a stipulated facts trial, the court convicted defendant of FIP. This timely appeal followed.

On appeal, defendant renews her contention that Bazer unlawfully extended the traffic stop without reasonable suspicion of drug possession, asserting that the trial court erred in denying her motion to suppress. The state argues that the court correctly denied defendant's motion because Bazer's drug investigation was supported by reasonable suspicion. For the reasons that follow, we conclude that the court erred in denying defendant's motion to suppress.

_____

[2] Defendant argues that the trial court erred in finding that the stop was extended into a drug investigation when Bazer began questioning defendant about drug possession. Defendant instead argues that the stop was extended moments earlier, when Bazer requested Sorby as backup. We need not decide which moment marked the stop's extension because the difference is of no consequence to the result; as defendant acknowledges in her opening brief, no new facts could have informed Bazer's reasonable suspicion analysis at the later point.

Article I, section 9, prohibits "unreasonable" searches and seizures. A "stop" is a type of seizure that amounts to a "temporary detention" conducted "for investigatory purposes." *Maciel-Figueroa*, 361 Or at 169-70. When an officer has lawfully stopped a person for a noncriminal traffic infraction, the officer is limited to those "investigatory inquiries that are reasonably related to the purpose of the traffic stop or that have an independent constitutional justification." *State v. Arreola-Botello*, 365 Or 695, 712, 451 P3d 939 (2019). As noted, the state contends that the constitutional justification for Bazer's unrelated criminal investigation here was that Bazer had reasonable suspicion that defendant possessed controlled substances. Reasonable suspicion exists when an officer subjectively believes that a person has committed or is about to commit a specific crime or type of crime, and that belief is objectively reasonable in light of the totality of the circumstances existing at the time of the stop. *Maciel-Figueroa*, 361 Or at 182.

Reasonable suspicion must be based on specific and articulable facts. *State v. Oller*, 277 Or App 529, 534, 371 P3d 1268 (2016), *rev den*, 361 Or 803 (2017). An officer can draw on his or her training and experience to make reasonable inferences under the circumstances, but "training and experience alone are not an adequate substitute for objectively observable facts." *Id*. However, "reasonable suspicion is a relatively low barrier." *State v. Jones*, 245 Or App 186, 192, 263 P3d 344 (2011), *rev den*, 354 Or 838 (2014) (internal quotation marks omitted). It is a "less demanding standard than probable cause." *State v. Brown*, 298 Or App 771, 775, 446 P3d 568, *rev den*, 365 Or 819 (2019). "Reasonable suspicion does not require that the facts as observed by the officer conclusively indicate illegal activity but, rather, only that those facts support the reasonable inference of illegal activity by that person." *State v. Dampier*, 244 Or App 547, 551, 260 P3d 730 (2011) (internal quotation marks omitted).

Although the trial court made no express factual findings on the issue, we presume the court implicitly found the subjective component of the reasonable suspicion standard had been met here—that Bazer believed defendant was committing the crime of illegal drug possession. The

issue, then, is whether Bazer's suspicion was objectively reasonable.

To reiterate, the facts that the state argue support the trial court's conclusion that the officer had an objectively reasonable suspicion that defendant was committing the crime of drug possession are: (1) the large, albeit unspecified, amount of cash defendant was carrying; (2) the fact that defendant was staying at and had just left the Crosslands Motel, a place associated with drug activity; (3) defendant's shaky hands and nervousness; and (4) the time of night of the stop (midnight). The state argues that, when viewed as a whole, Bazer's observations established reasonable suspicion that defendant possessed some sort of controlled substance. We consider each circumstance individually in the order listed above, before evaluating the weight of all the circumstances together.

First, we conclude that the "large amount of US currency" rolled up in defendant's wallet does not provide much support for Bazer's suspicion that defendant possessed controlled substances. While crediting Bazer's testimony that cash is frequently used for the sale and purchase of illegal drugs, that alone is insufficient to make defendant's possession of cash indicative of drug possession. Although Bazer testified that, in his experience, "smaller bills" specifically were used in the drug trade, he was not able to say whether defendant carried the precise type of cash he found to be common to the drug trade. Additionally, carrying United States currency is simply too general of a practice to support reasonable suspicion of a drug crime on its own. Indeed, Bazer testified that cash is used in the drug trade because everyone has it. We decline to assign suspicion to possession of something as common as cash, especially when we have no idea how much cash defendant possessed, the denomination of the bills, or any other details which could help characterize the cash in this case as suspicious. *See State v. Kennedy*, 45 Or App 911, 918, 609 P2d 438 (1980), *rev'd on other grounds*, 290 Or 493, 624 P2d 99 (1981) (concluding facts that the defendant paid for his airline ticket with cash and had a "large amount" of cash on him did not support reasonable suspicion that he was a drug smuggler because

"[i]t is still legal to pay with cash rather than by credit card, and we have no idea how much money a 'large amount' is").[3] While we do not rule out the possibility that possessing a large quantity of cash could lead to reasonable suspicion of criminal activity on some other record, on this record, defendant's unspecified roll of cash contributes little, if any, weight to the reasonable suspicion analysis.

Second, the fact that defendant was staying at, and had just left, the Crosslands Motel adds little to the reasonable suspicion analysis, because there is nothing inherently suspicious, without more evidence, about a defendant staying at a public motel where drugs have been sold. "We have repeatedly said that a person's presence in a location associated with drug activity is insufficient to support an objectively reasonable belief that that person is himself or herself engaged in drug activity." *State v. Bertsch*, 251 Or App 128, 134, 284 P3d 502 (2012); *see also, e.g.*, *State v. Martin*, 260 Or App 461, 477, 317 P3d 408 (2014) (concluding that there is "nothing inherently suspicious" about being in a "high-vice area"); *State v. Zumbrum*, 221 Or App 362, 369-70, 189 P3d 1235 (2008) (fact that the defendant was staying at an apartment building known for drug activity, located in a high-crime neighborhood, did not support reasonable suspicion); *State v. Rutledge*, 243 Or App 603, 610, 260 P3d 532 (2011) (no reasonable suspicion of narcotics when the defendant "had just left a motel that the police believed was involved in drug activity, was in a car with a person suspected of drug activity, and acted nervously when asked about her purse"). The limited cases in which a defendant's association with a high-crime area has been given weight are distinguishable. Mainly, those cases presented us with some sort of additional evidence that, when

---

[3] Although we do not rely on it for our analysis, defendant made an important point during oral argument that is worth noting. There, defendant offered the additional context that use of cash is more common among individuals living in poverty. Indeed, a majority of unbanked households report that they pay bills using cash and "[d]o not have enough money to keep in an account." Federal Deposit Insurance Corporation, *2017 FDIC National Survey of Unbanked and Underbanked Households Executive Summary* 4, 12 (2017), available at https://www.fdic.gov/householdsurvey/2017/2017execsumm.pdf. While we do not speculate as to defendant's use of cash or banking status, we acknowledge that the state's characterization of possession of a large amount of cash as unusual and suspicious can be problematic considering these realities.

viewed in the totality of the circumstances, indicated the defendant's presence at the location was associated with suspected drug activity. *See, e.g.*, *State v. Barber*, 279 Or App 84, 94-95, 379 P3d 651 (2016) (reasonable suspicion existed where the defendant made a short visit to an apartment that was under surveillance for drug activity, engaged in "possible drug activity" in his car before leaving the apartment, and exhibited suspicious behavior when pulled over). Here, defendant was not observed making a quick stop at the motel consistent with a drug sale or purchase. She was not seen engaged in a suspicious handoff. Instead, the evidence established only that defendant was staying at the motel, a fact which is not inherently suspicious, especially in light of Bazer's testimony that legitimate customers also stayed there.

Third, defendant's nervousness contributes little if anything to this reasonable suspicion analysis, because that nervousness is not linked to facts that indicate that defendant was nervous as a result of her involvement in criminal drug activity. Here, we find two of our previous decisions helpful—one in which the defendant's nervousness did carry weight, and in which there was objectively reasonable suspicion of drug possession. In the other case, we drew the opposite conclusion. In *State v. Huffman*, 274 Or App 308, 315, 360 P3d 707 (2015), *rev den*, 358 Or 550 (2016), we concluded that the officer had objectively reasonable suspicion to believe that the defendant possessed a controlled substance. The officer was on patrol in a "high drug-activity area" when he pulled the defendant over for traffic violations. *Id*. at 309. After pulling over, the defendant immediately left his car and began walking towards the patrol car. *Id*. The officer found that to be suspicious, and believed, based on his training and experience, that it indicated that the defendant could be "trying to hide something by diverting attention away from the car or attempting to flee." *Id*. Once the officer directed the defendant back to his car, the defendant was very nervous, visibly shaking, and did not make eye contact. *Id*. at 310. Throughout the stop, the defendant was "fidgety" and made "furtive movements with his hands towards the front pocket of his sweatshirt." *Id*. The officer subsequently learned that the defendant was on probation for possession

of heroin. *Id*. Based on the above, the officer asked the defendant for consent to search the car. *Id*.

Although we acknowledged that generally, "nervousness alone is entitled to little weight when evaluating reasonable suspicion," we concluded that the defendant's nervousness contributed to reasonable suspicion. *Id*. at 314. We considered the defendant's nervousness in the context of his unusual exit from his car, and the officer's experience that individuals do not leave their vehicles during traffic stops unless they are about to flee or are trying to divert attention from the car. *Id*. "[D]efendant's distracting conduct in leaving the car provided [the officer] with an indication of *why* [the defendant] might be nervous—that he was trying to hide something." *Id*. (emphasis in original). Further, the other facts known to the officer (the "high drug-activity area," the defendant's furtive movements toward his pocket, and the defendant's probation for heroin) implied that the "something" the defendant was trying to hide was illegal drugs specifically. *Id*. at 315. Considering the totality of those circumstances, the defendant's nervousness was entitled to be given more weight than it would normally carry because it was linked to other facts that supported reasonable suspicion of drug possession. *Id*.

We reached the opposite conclusion in *State v. Decker*, 290 Or App 321, 417 P3d 449 (2018). There, the defendant was pulled over for a traffic violation. *Id*. at 323. When the officer activated his overhead lights, the defendant "slowed down to 10 to 15 miles an hour." *Id*. The officer noticed the driver's head move towards the center of the vehicle multiple times while the vehicle continued, ultimately travelling for 29 seconds at a very low speed before it stopped. *Id*. Upon approaching, the officer observed that the defendant was nervous, "would only glance at" him, and "kept looking towards the center console, down at his feet." *Id*. at 324. The defendant told the officer "that he was traveling between two points that 'were on the other side of town completely' from where the stop occurred." *Id*. He also reported that the vehicle belonged to his girlfriend, who the officer knew to be "involved in controlled substances." *Id*. Based on the above, the officer suspected that the defendant possessed drugs or weapons. *Id*. at 325.

We ultimately concluded in *Decker* that the officer did not have reasonable suspicion that the defendant possessed drugs. Although the officer's observations may have led him to think that the defendant "was trying to hide *something*," there was not an adequate factual basis for the officer to suspect he was trying to hide illegal drug activity specifically. *Id*. at 331 (emphasis in original). The only fact that arguably raised an inference that the defendant was nervous about drugs was the fact that the defendant was driving a car that belonged to a person involved in controlled substances. *Id*. at 332. That fact alone was not sufficient to link the defendant's suspicious behavior to reasonable suspicion of drug possession specifically. *Id*.

This case is more like *Decker* than *Huffman*, because there are insufficient facts to indicate that defendant was nervous *because* she possessed drugs. The only facts that arguably implied that the "something" defendant was nervous about was controlled substances were that (1) she had a large roll of cash (which the officer knew was the most common payment method in illegal drug sales) and (2) she was staying at and had just left the Crosslands Motel, a place known for drug activity. First, as we explained above, neither of those facts are particularly suspicious or raise a strong inference that defendant possessed drugs. Second, nothing linked defendant's nerves to her roll of cash, her association with the Crosslands Motel, or any other fact indicative of drug possession. Here, Bazer never linked defendant's nervousness to anything in particular. Without a link between defendant's nervousness and any fact supporting objectively reasonable suspicion of drug possession, nervousness, even extreme nervousness, is relatively meaningless to our reasonable suspicion analysis. *See, e.g.*, *State v. Reich*, 287 Or App 292, 299, 403 P3d 448 (2017) ("We have repeatedly stated that nervous behavior adds little to the reasonable suspicion inquiry."); *State v. Espinoza-Barragan*, 253 Or App 743, 750, 293 P3d 1072 (2012) ("[N]ervousness during a traffic stop contributes little, if any, weight toward reasonable suspicion that the driver is engaged in criminal activity."); *State v. Kentopp*, 251 Or App 527, 532, 284 P3d 564 (2012) (the fact that the defendant's nervous demeanor was not tied to anything in particular, and could be ascribed

to "any number of things," rendered it of little value in the reasonable suspicion analysis). Thus, we give little weight to defendant's nervousness here.

Finally, the fact that this traffic stop occurred at midnight does not support a finding of reasonable suspicion, particularly in light of defendant's plausible, innocent explanation that she was giving her passenger a ride home after visiting her. Obviously, people travel at midnight for legitimate reasons unrelated to criminal activity generally or drug possession specifically. And, unlike in other cases, nothing about defendant's travelling at midnight was linked with other facts that would make the time of night indicative of a specific criminal activity. *Cf. State v. Wiseman*, 245 Or App 136, 142-43, 261 P3d 76 (2011) (officer had reasonable suspicion of theft to stop a truck when a neighbor observed the occupants of the truck loading a bike into the truck's bed at 1:50 a.m. in a high-crime area and the occupants made furtive movements when the patrol car passed them).

We are mindful that, in considering whether articulated facts are sufficient to establish objectively reasonable suspicion, we must view those facts in their totality and not individually. Here, however, each of the articulated facts—that defendant was carrying a roll of cash, that she was staying at and had just left the Crosslands Motel, that she exhibited out-of-proportion nervousness, and that it was midnight—are not facts that inherently raise suspicion of criminal activity whether viewed individually or collectively. Most of those facts fail to tell us why *this* defendant in particular is suspected of possessing drugs at the relevant time, rather than pointing the finger at anyone who carries cash, stays at a public motel where criminal activity also occurs, and drives their car at night. *See State v. Bates*, 304 Or 519, 526, 747 P2d 991 (1987) ("Neither the hour nor the 'high crime' nature of the area tells us whether *this* defendant is likely to be a criminal, unless there is some reason to think that everyone driving in that particular area at that time of night is up to no good (or is a policeman)." (Emphasis in original.)). We do not permit police to stop and investigate citizens for specific crimes just because the situation seems odd, or because the officer believes the individual is up to

*something*. The facts in this case are certainly not enough to establish reasonable suspicion of drug possession specifically, without more. And Bazer's training and experience of drug activity in that area cannot take the place of articulable facts to provide that "something more" in this case. Although an officer may consider facts in light of his training and experience, that experience cannot itself supply the facts. *State v. Schmitz*, 299 Or App 170, 178, 448 P3d 699 (2019). Considering the totality of the circumstances known to Bazer at the time he began investigating defendant for drug possession, we conclude that Bazer did not have reasonable suspicion that defendant was engaged in the crime of possessing controlled substances.

Finally, we consider the issue of harmlessness. "We must affirm a judgment, despite any error committed at trial, if we determine that there is little likelihood that the particular error affected the verdict." *State v. Strasser*, 303 Or App 566, 571, 464 P3d 497 (2020) (internal quotation marks and citation omitted). Here, the officer's drug investigation led to the discovery of a handgun, which defendant admitted belonged to her. That was the only evidence presented that defendant possessed a firearm, and it subsequently led to her conviction for the crime of FIP. The evidence that defendant sought to suppress was essential to her conviction, and the error in denying the suppression motion was, therefore, not harmless.

Accordingly, we reverse and remand this case to the trial court for further proceedings.

Reversed and remanded.