Argued and submitted May 27, 2014, affirmed May 28, 2015

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DARRIN PETER McHAFFIE,
*Defendant-Appellant.*

Douglas County Circuit Court
10CR2523FE; A152112

350 P3d 600

Sarah Laidlaw, Deputy Public Defender, argued the cause for appellant. With her on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Pamela J. Walsh, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Mooney, Judge pro tempore.

SERCOMBE, P. J.

**SERCOMBE, P. J.**

Defendant appeals a judgment of conviction for unlawful possession of methamphetamine in violation of ORS 475.894. He assigns error to the trial court's denial of his motion to suppress evidence discovered after he complied with an officer's request to empty his pockets during the stop of a vehicle in which he was a passenger. Specifically, defendant asserts that, before the evidence was discovered, the officer had unlawfully seized him without reasonable suspicion in violation of Article I, section 9, of the Oregon Constitution. We conclude that the officer's stop of defendant was supported by reasonable suspicion and, therefore, we affirm.

We review the trial court's denial of a motion to suppress for legal error and "are bound by the trial court's findings of historical fact that are supported by evidence in the record." *State v. Holdorf,* 355 Or 812, 814, 333 P3d 982 (2014). In light of that standard, we describe the facts consistently with the trial court's undisputed factual findings.

At 11:30 p.m., Tilley, a patrol sergeant with the Douglas County Sheriff's Office, was posted at an intersection in Yoncalla when he observed a Nissan truck turn without signaling. He also observed that one of the tail lights on the truck was broken. Tilley ran a computer check and determined that the registered owner of the truck, Meza, was on felony probation for delivery of methamphetamine. Tilley then initiated a traffic stop.

After the overhead lights on the patrol car were activated, Meza, who was driving the truck, turned his vehicle across the center line of the road and parked on the opposite side of the street. Once the Nissan had stopped, Meza and defendant, who was a passenger in the truck, quickly got out of the vehicle. Tilley had not asked them to do so, and it was unusual for people he stopped to behave in that manner. In Tilley's experience, people who do so are attempting to put distance between themselves and the contents of the vehicle. Both Meza and defendant appeared "extremely nervous."

After getting out of the truck, defendant approached Tilley and Meza, who were on the driver's side of the vehicle,

and asked why Tilley had stopped them. Tilley, who was working alone at that point, had one man on each side of him and was concerned for his safety. However, the tone of the conversation between defendant and Tilley was cordial. Tilley told defendant he looked familiar and asked his name. After defendant told Tilley his name, Tilley disclosed that he had worked for a time as a corrections officer and asked defendant whether he had been in jail. Defendant affirmed that he had been in jail several times and that he had been arrested for possession of methamphetamine.

During that time, defendant was engaged in a behavior that Tilley called "indexing." Specifically, defendant repeatedly touched his front right pants pocket and several times placed his hand inside that pocket and then pulled it back out without removing anything from inside. Tilley had been an officer with the Douglas County Sheriff's office for more than 10 years, part of it as a narcotics detective, and had participated in "in depth training on apprehension, investigation and identification of controlled substances" and conducted many arrests relating to controlled substances in that time. In Tilley's training and experience, people who possess drugs often engage in those behaviors, which serve to "verify the location of the narcotics." Indeed, Tilley had conducted arrests of individuals engaged in that behavior on previous occasions and had located contraband in the area indicated by the "indexing" behavior.

Tilley then asked defendant for his identification. When defendant handed him the identification, Tilley noticed that defendant's movements were exaggerated and that his hands were shaking. The exaggerated movements led Tilley to believe that defendant was under the "influence of something or had recently used."

After receiving defendant's identification, Tilley asked defendant if he had anything illegal on him, and defendant responded that he did not. Tilley then asked defendant if he would be willing to empty his pockets and defendant agreed to do so. As defendant was emptying his pockets, Tilley noticed that he reached into his front right pants pocket several times but did not take anything out of it. Tilley then asked defendant if he had anything in his coin

pocket. Defendant put his fingers inside the coin pocket and then "quickly cuffed something in the palm of his hand."

Based on his training and experience, Tilley believed that defendant was attempting to hide contraband in his hand. He grabbed defendant's hand and asked what he had in it. Defendant responded that he had a "rinse bag"—that is, a small plastic bag with drug residue—that he had forgotten was in his pocket. He then slowly opened his hand to reveal a clear plastic baggie with a white crystal substance that Tilley suspected to be methamphetamine. Tilley then arrested defendant and, subsequently, obtained additional incriminating evidence.

After being charged with unlawful possession of methamphetamine, defendant filed a motion to suppress evidence obtained as a result of his interaction with Tilley. Defendant contended that Tilley had stopped him without reasonable suspicion when Tilley obtained his identification. In defendant's view, because the evidence of controlled substances was obtained as a result of that unlawful seizure, the court was required to suppress the evidence. After a hearing, the trial court concluded that defendant was stopped when the officer grabbed his hand, but, in light of all the surrounding circumstances, the stop was lawful. Because it concluded that the seizure was lawful in this case, the trial court denied defendant's motion to suppress. Defendant then waived his right to a jury trial and, following a stipulated facts trial, the court found defendant guilty of unlawful possession of methamphetamine.

On appeal, defendant asserts that he was seized either when Tilley took his identification card or, at the latest, when Tilley grabbed his hand. According to defendant, in either case, Tilley did not have reasonable suspicion to support the seizure. The state responds that the stop occurred when Tilley "grabbed defendant's hand." The state further asserts that, when Tilley stopped defendant, "he had reasonable suspicion that defendant possessed drugs." As explained below, we conclude that, before Tilley received defendant's identification, he had reasonable suspicion of drug possession and, therefore, the trial court properly denied defendant's motion to suppress.

Article I, section 9, protects "the right of the people to be secure in their persons * * * against unreasonable search, or seizure." "[E]ncounters between law enforcement officers and citizens are of an infinite variety." *State v. Backstrand*, 354 Or 392, 398, 313 P3d 1084 (2013) (internal quotation marks omitted). "Of that infinite variety, only some implicate the prohibition in Article I, section 9, against unreasonable seizures." *Id.* at 398-99 (internal quotation marks omitted).

> "Analytically, police-citizen encounters typically fall into one of three categories that correlate the degree of intrusiveness on a citizen's liberty with the degree of justification required for the intrusion. At one end of the continuum are mere encounters for which no justification is required. At the other end are arrests, which involve protracted custodial restraint and require probable cause. In between are temporary detentions for investigatory purposes, often termed 'stops,' which generally require reasonable suspicion. Both stops and arrests are seizures for constitutional purposes, while less restrictive encounters are not."

*State v. Fair*, 353 Or 588, 593-94, 302 P3d 417 (2013) (citations and footnote omitted). A "temporary restraint of a person's liberty for the purpose of criminal investigation—*i.e.*, a 'stop'—qualifies as a 'seizure,' under Article I, section 9, and must be justified by a reasonable suspicion of criminal activity." *State v. Rodgers/Kirkeby*, 347 Or 610, 621, 227 P3d 695 (2010).

As the court explained in *Backstrand*, "[w]hat distinguishes a seizure (either a stop or an arrest) from a constitutionally insignificant police-citizen encounter 'is the imposition, either by physical force or through some "show of authority," of some restraint on the individual's liberty.'" 354 Or at 399 (quoting *State v. Ashbaugh*, 349 Or 297, 309, 244 P3d 360 (2010)). Determining whether an encounter constitutes a stop is fact-specific inquiry, and requires us to evaluate whether a reasonable person would "believe that a law enforcement officer intentionally and significantly restricted, interfered with, or otherwise deprived the individual of his or her liberty or freedom of movement." *Id.* However, "police requests for information or cooperation do not implicate Article I, section 9, as long as the officer

does no more than seek the individual's cooperation through noncoercive questioning and conduct." *Id.* at 417. Thus, in *Backstrand,* the court explained that an officer does not seize an individual simply by asking for identification:

> "A request for identification, in and of itself, is not a seizure. Nor is an officer's act of checking the validity of that identification, in and of itself, a seizure. For a request and verification of identification to amount to a seizure, something more is required on an officer's part. Either through the context, the content or manner of questioning, or the other circumstances of the encounter, the officer must convey to a reasonable person that the officer is exercising his or her authority to significantly restrain the citizen's liberty or freedom of movement."

*Id.*

Here, Tilley conducted a lawful traffic stop of the vehicle in which defendant was riding. After the truck stopped, defendant immediately got out and initiated an encounter with Tilley: He approached Tilley and asked why the vehicle had been stopped. Tilley observed that defendant looked familiar and asked his name. He then noted that he had been a corrections officer and asked defendant if he had been in jail. After defendant responded to that inquiry, Tilley asked him for identification. Nothing about that interaction would convey to a reasonable person that the officer was exercising his authority to significantly restrain the person's liberty or freedom of movement. Thus, defendant was not seized prior to the time that Tilley received his identification. However, we need not decide at precisely what point the stop occurred once defendant gave Tilley his identification. Even assuming defendant was stopped when Tilley took his identification, by that point, the circumstances gave rise to reasonable suspicion that defendant was engaged in criminal activity.

As noted, for a stop to be lawful, the police officer must have reasonable suspicion, that is, the officer "must have held a belief that was objectively reasonable under the totality of the circumstances existing at that time and place, that [the] defendant had committed a crime." *State v. Ehly,* 317 Or 66, 79, 854 P2d 421 (1993). "An officer must identify specific and articulable facts that produce a reasonable

suspicion, based on the officer's experience, that criminal activity is afoot." *State v. Mitchele*, 240 Or App 86, 91, 251 P3d 760 (2010); *see also State v. Meza-Garcia*, 256 Or App 798, 803, 303 P3d 975 (2013) (an "officer's training and experience are relevant considerations that bear on the reasonable factual inferences that an officer may draw" (internal quotation marks omitted)).

> "The standard of 'reasonable suspicion' justifying a police intrusion on [the liberty interest in freedom from unreasonable searches and seizures] when a person is stopped was intended to be less than the standard of probable cause to arrest. A stop is unlawful unless it meets an objective test of reasonableness based on observable facts. Officer intuition and experience alone are not sufficient to meet that objective test. However, if an officer is able to point to specific and articulable facts that a person has committed a crime or is about to commit a crime, the officer has 'reasonable suspicion' and may stop the person to investigate."

*Holdorf*, 355 Or at 823.

Here, before he received defendant's identification, the specific and articulable facts known to Tilley were that (1) the driver of the vehicle in which defendant was riding was a methamphetamine user; (2) after Tilley initiated the traffic stop, both occupants immediately got out of the vehicle; (3) defendant had been involved in methamphetamine use in the past; (4) both defendant and the driver appeared extremely nervous; (5) defendant was engaged in "indexing," which was associated with possession of contraband; and (6) when retrieving his identification, defendant used exaggerated movements that indicated to Tilley that defendant was under the influence. In our view, those circumstances, considered together, gave rise to reasonable suspicion that defendant was engaged in criminal possession of a controlled substance.[1]

Here, both defendant and the driver of the vehicle were known to Tilley to have been involved in methamphetamine

---

[1] We note that defendant argues that his "indexing" behavior did not provide reasonable suspicion. We do not consider that conduct standing alone, only as part of our evaluation of whether the totality of the circumstances gave rise to reasonable suspicion. *See Holdorf*, 355 Or at 824 ("[J]udicial review looks to the totality of the circumstances confronting a police officer * * *.").

use. Specifically, the driver was on felony probation for delivery of methamphetamine and defendant had previously been in jail for possessing methamphetamine. Although "a defendant's association with a known drug user is not enough, standing alone, to establish reasonable suspicion that the defendant is engaged in illegal drug activity," *State v. Clink*, 270 Or App 646, 651, 348 P3d 1187 (2015), those facts are part of the totality of the circumstances to be considered. *See State v. Nichols*, 269 Or App 429, 433, 345 P3d 468 (2015) (although "merely being in the company of visibly intoxicated people while leaving a pub would be insufficient by itself to establish reasonable suspicion * * *, that fact is nonetheless part of the totality of the circumstances that [the officer] confronted and that [the court] must thus consider"). Furthermore, here, not only were defendant and the driver known to Tilley to have been involved with methamphetamine, but Tilley also observed exaggerated movements on defendant's part that indicated that defendant was under the influence. Those circumstances, taken together, contributed to Tilley's reasonable suspicion that defendant was in possession of contraband. *See Holdorf*, 355 Or at 829 (an officer's observation that the defendant was "tweaking," taken together with the officer's knowledge that the driver of the vehicle in which the defendant was riding was "a known felon with an outstanding warrant who was under investigation as a suspect in a local methamphetamine distribution ring," gave rise to a "reasonable inference that defendant committed the crime of possession of methamphetamine"); *see also Ehly*, 317 Or at 80 (totality of the circumstances included officers' observation that the suspect appeared to be under the influence of methamphetamine).

Furthermore, both defendant and the driver were extremely nervous and shaking and defendant engaged in additional behaviors that Tilley's training and experience taught him were associated with possession of drugs or other contraband. First, defendant and the driver immediately got out of the vehicle in which they had been riding as soon as it was stopped. According to Tilley, that behavior is unusual and is frequently done in an attempt by individuals to distance themselves from contraband inside a vehicle. In addition, defendant engaged in the behavior of repeatedly

touching and reaching inside his right pants pocket without removing anything from the pocket. In Tilley's training and experience, people who have illegal drugs will often engage in this behavior, thereby verifying the location of the contraband.

As the court noted in *Holdorf*, an officer's training and experience are taken into consideration in criminal cases when determining reasonable suspicion, but that training and experience "is not presumed based solely upon a police officer's employment status." 355 Or at 829. Rather, it must be established through "evidence of specific articulable facts that permit an officer to make a reasonable inference based on the officer's pertinent training and experience." *Id.* In his decade of experience, Tilley had conducted many arrests relating to drug possession. In that time, he had conducted drug arrests of individuals who were engaging in "indexing" behavior, and he had discovered drugs in the location indicated by that conduct. All those circumstances contribute to the conclusion that, by the time he received defendant's identification, Tilley reasonably suspected that defendant was engaged in illegal activity.

Although none of the circumstances in this case, considered alone, might be sufficient to constitute specific and articulable facts that defendant had committed a crime or was about to commit a crime, that is not the test. Rather, as noted, in determining whether the officer had reasonable suspicion we consider all of the circumstances together. Here, taken together, defendant's unusual behavior in leaving the vehicle when it was stopped, his past association with methamphetamine as well as the driver's drug history, defendant's symptoms of recent drug use, and his "indexing" behavior constitute specific and articulable facts that support a reasonable inference of illegal activity. *See Clink*, 270 Or App at 650 (an officer had reasonable suspicion based on the following circumstances, taken together: "(1) a named informant reported that a 'couple of guys' were 'smoking something' in a vehicle; (2) the location of the call was not a high-crime area, the call was 'not a typical call for this type of place,' and calls from that area are 'usually accurate'; (3) defendant made furtive movements, and it looked like

defendant was attempting to conceal 'something hard,' which [the officer] believed could have been a weapon; and (4) [the officer] knew that defendant's passenger was a methamphetamine user"). Because the officer had reasonable suspicion, the stop was lawful and the trial court did not err when it denied defendant's motion to suppress.[2]

Affirmed.

---

[2] To the extent defendant, in his brief, attempts to challenge the lawfulness of the officer's conduct on grounds other than that discussed herein—that he was unlawfully stopped without reasonable suspicion—those arguments were not raised before the trial court and we do not consider them. *See* ORAP 5.45(1) ("No matter claimed as error will be considered on appeal unless the claim of error was preserved in the lower court[.]").