HADLOCK, J.
*323 Defendant appeals a judgment of conviction for unlawful possession of methamphetamine, ORS 475.894, and felon in possession of a restricted weapon, ORS 166.270(2). Defendant was convicted of those crimes in a stipulated-facts trial after the trial court denied his motion to suppress evidence that law enforcement officers found after stopping the vehicle that defendant was driving for a traffic violation. On appeal, defendant contends that the evidence should have been suppressed because officers found it after one officer, Oregon State Police Sergeant Barden, unlawfully extended the traffic stop. The state argues that Barden was justified in extending the stop because he had reasonable suspicion that defendant unlawfully possessed drugs or a weapon. We conclude that the record does not support a finding that Barden reasonably suspected defendant either of unlawfully possessing controlled substances or of unlawfully possessing a weapon. The trial court therefore erred when it denied defendant's suppression motion. Because that error was not harmless, we reverse and remand.
In the course of denying defendant's suppression motion, the trial court made factual findings that neither party challenges. We state the facts consistently with those express findings, which the record supports. State v. Shaff , 343 Or. 639, 641, 175 P.3d 454 (2007). In addition, we presume that the trial court implicitly resolved any other disputed factual matters "consistently with its ultimate conclusion" to the extent that resolving those factual disputes was necessary to the court's conclusion and to the extent that the record supports the implicit findings. Pereida-Alba v. Coursey , 356 Or. 654, 671, 342 P.3d 70 (2015).
The events that culminated in defendant's arrest began when Barden conducted a traffic stop after he saw a moving vehicle "almost straddling the center line." Barden activated his overhead lights and followed the vehicle, which slowed down to 10 or 15 miles an hour but did not immediately stop. Rather, Barden could see a silhouette of the driver's head moving to the right, toward the center of the vehicle, more than once. The vehicle kept going for 29 seconds at a very low speed before it stopped; Barden characterized *324 that as an "extremely slow pull *451 over" on a road on which there was no other traffic, although there was no place for the vehicle to pull completely off the road. Barden became increasingly nervous that "something's going to happen," like an attempt by the driver to flee or "a weapon * * * com[ing] into play." Barden explained at the suppression hearing that, from his training and experience, he develops a concern about a driver accessing or concealing weapons when it takes a driver as long to pull over as happened in this case.
After the vehicle stopped, Barden approached slowly, on high alert. His concern decreased once he could see the hands of the driver (defendant) and observed no weapons. Defendant told Barden that his driver's license was suspended and verbally identified himself instead of producing identification in response to the sergeant's request.
Although defendant's voice was fairly calm, he "would only glance at [Barden] and then he kept looking towards the center console, down at his feet, he just kept glancing, kept glancing, kept glancing, the whole time he was talking." That, in conjunction with "the very long pullover," heightened Barden's concern about weapons-specifically, "weapons that have been placed there"-although Barden did not believe that defendant posed an immediate threat because Barden could clearly see his hands.
Barden went back to his patrol car to verify defendant's identity. That took only a couple of minutes; during that time, Senior Trooper Chambers arrived at the scene. Barden asked Chambers to watch defendant, indicating Barden's concern about weapons. At about the time that dispatch verified that defendant's license was suspended, Chambers went to Barden's patrol car and told him that defendant had given an "odd" story about where he was driving; defendant had said that he was traveling between two points that "were on the other side of town completely" from where the stop occurred. Chambers also told Barden that the vehicle belonged to defendant's girlfriend, who was "known to be involved in controlled substances." Barden does not think that he and Chambers talked about anything else at that time.
*325 Barden then had all the information he needed to issue a citation to defendant, but he had not completed writing that citation. At that point, Barden testified, he went back to defendant's vehicle, suspecting that defendant was engaged in criminal activity:
"When I recontacted him, at that point I had reason to believe, based off of what I had seen from the highly abnormal pullover, from his movements in the vehicle, from especially his actions of he kept glancing down, kept glancing down next to where he was seated, and then the additional information about where he was going to, which didn't seem to match at all where we were, that he was involved in criminal activity."
Accordingly, Barden began investigating the suspected criminal activity, transforming the stop-in his mind-from a traffic stop to a criminal stop. Barden asked defendant again where he was going, what he had hidden in the vehicle by the seat, and-after defendant denied having hidden anything-about drugs and weapons. Defendant did not consent to Barden's request to search the vehicle. Believing that he reasonably suspected defendant of criminal activity, Barden told defendant to get out of his vehicle so that a narcotics-detection dog could externally sniff it. Barden asked defendant whether he could pat him down for weapons; defendant refused and started reaching for his pockets. At that point, Barden patted him down for officer-safety reasons and brought him back to the patrol car.
At some point-the record does not indicate much about when, and the trial court made no finding on this point-Chambers alerted Barden to a knife that was visible on the center console; Barden had not known that the knife was there.[1] Barden retrieved *452 the knife and verified that it snapped open with centrifugal force, making it a knife that was unlawful for defendant, a felon, to possess. *326 Barden testified that at some point, "[e]arlier on in the stop," Chambers had told him that defendant was a convicted felon. Nothing in the record indicates how much earlier during the stop that communication occurred.
While a third officer waited with defendant at Barden's patrol car, Barden and Chambers searched defendant's vehicle for additional weapons. Although they did not find more weapons, they did find several baggies that contained methamphetamine, in the area where defendant had been looking. Defendant subsequently was charged with unlawful possession of methamphetamine and felon in possession of a restricted weapon. As noted, the trial court convicted defendant after denying his suppression motion, and defendant appeals.
On appeal, defendant argues that the trial court erred in denying the suppression motion because Barden impermissibly started investigating whether defendant unlawfully possessed drugs or weapons "instead of prosecuting the traffic infractions." According to defendant, that investigatory extension of the stop violated his rights under Article I, section 9, of the Oregon Constitution because Barden did not have reasonable suspicion that he unlawfully possessed either controlled substances or weapons. According to defendant, the delay before he stopped his vehicle, his nervous behavior and movements in the vehicle, his association with a person known to be involved with illegal drugs, and his odd story about where he was driving did not combine to give Barden reasonable suspicion that he then possessed controlled substances. Defendant similarly argues that the circumstances did not give rise to reasonable suspicion that he unlawfully possessed a weapon, because the record does not support a finding that Barden knew of the facts necessary to give rise to a reasonable belief that defendant was a felon in possession of a restricted weapon-in particular, that defendant was a felon-before he told defendant to get out of the vehicle and patted him down. In response, the state argues that the record supports a determination that Barden reasonably suspected that defendant was engaged in criminal activity before he stopped processing the traffic citation and, instead, began a criminal investigation.
*327 We begin our analysis by emphasizing what is not at issue on appeal. First, defendant does not challenge the lawfulness of the original traffic stop. Second, the state does not dispute that Barden extended that stop when he started questioning defendant upon "recontacting" him; as Barden candidly testified, those questions did not relate to the traffic stop but "had to do with [Barden's] suspicion of [defendant's] involvement in criminal activity," and Barden viewed the encounter as having transformed into a criminal stop at that time. Third, the state does not seek to defend Barden's extension of the stop on officer-safety grounds (Barden did not testify that officer-safety concerns prompted either his questions to defendant or his decision to order defendant out of his vehicle). Rather, the state argues only that Barden's extension of the stop was justified because Barden reasonably suspected that defendant unlawfully possessed drugs or guns.
We turn to that issue. In State v. Maciel-Figueroa , 361 Or. 163, 179, 389 P.3d 1121 (2017), the Supreme Court emphasized that an investigatory stop cannot be justified on suspicion of generalized "criminal activity" that is not identified with any specificity. Rather, the officer "must reasonably suspect that the defendant has committed or is about to commit a specific crime or type of crime." Id. at 180, 389 P.3d 1121. A court considering whether reasonable suspicion justified a stop (or extension of a stop) must therefore engage in this two-step analysis:
"[T]he court (1) must find that the officers actually suspected that the stopped person had committed a specific crime or type of crime, or was about to commit a specific crime or type of crime, and (2) must conclude, *453 based on the record, that the officers' subjective belief-their suspicion-was objectively reasonable under the totality of the circumstances existing at the time of the stop."
Id. at 182. As applied here, that principle requires us to determine whether the record supports a determination that Barden actually and reasonably suspected defendant either of unlawfully possessing controlled substances (one "type of crime"; see id. ) or of unlawfully possessing a weapon, which is a different type of crime, or both.
*328 We first consider the possibility that Barden's extension of the stop was justified by reasonable suspicion that defendant possessed drugs, which is the primary theory that the state propounded below. To reiterate, the circumstances that the state argues contributed to reasonable suspicion of drug possession are: (1) defendant's delay in pulling over, (2) his movement inside his vehicle, including repeatedly looking at the center console, (3) his nervousness during the stop, including repeatedly looking at the center console, (4) his odd story about where he was driving, and (5) the fact that he was driving a vehicle that belonged to a person known to be involved with drugs. In considering whether those circumstances gave rise to reasonable suspicion of drug possession, we find two of our recent decisions helpful-one in which the circumstances did give rise to reasonable suspicion of that crime, and one in which the circumstances did not.
We take the latter case first. In State v. Reich , 287 Or.App. 292, 293, 403 P.3d 448 (2017), an officer lawfully conducted a traffic stop of a truck that the officer knew was owned by a person whom he had arrested for possessing methamphetamine. The driver (ultimately, the defendant) initially was cooperative, and the passenger (the truck's owner) looked through the glove box for insurance information that the officer requested. Id. at 292-93, 403 P.3d 448. However, after the officer asked the defendant whether anything illegal was in the truck (while the passenger was still looking for proof of insurance), the defendant "became nervous, looked away, acted like he did not hear the question, and did not respond." Id. at 294, 403 P.3d 448. Indeed, the defendant "went from making eye contact" with the officer "to almost solely staring at the glove compartment that [the passenger] was looking through." Id. The officer testified that the drastic change in the defendant's demeanor made it clear to him that "there was something in that vehicle." Id. An investigation ensued, revealing methamphetamine. Id. at 294-96, 403 P.3d 448.
We held that the circumstances leading up to that investigation did not give the officer reasonable suspicion that the defendant possessed controlled substances. Id. at 302, 403 P.3d 448. We found little significance to defendant's nervousness and staring at the glove box, noting that we "have *329 repeatedly stated that nervous behavior adds little to the reasonable suspicion inquiry." Id. at 299, 403 P.3d 448. We also found little significance in the fact that the passenger had possessed methamphetamine in the past, emphasizing our previous recognition that "association with a person involved with methamphetamine does not support a reasonable suspicion that a defendant is * * * involved with methamphetamine." Id. at 300, 403 P.3d 448. In holding that the trial court should have granted the defendant's suppression motion, we contrasted cases like State v. Holdorf , 355 Or. 812, 333 P.3d 982 (2014), where "something more" was present. Reich , 287 Or.App. at 300, 403 P.3d 448 ; see also Holdorf , 355 Or. at 829-30, 333 P.3d 982 (holding that officers had reasonable suspicion where, in addition to exhibiting nervousness, the defendant was "tweaking" and the passenger in the vehicle "was a known felon with an outstanding warrant who was under investigation as a suspect in a local methamphetamine distribution ring").
We reached an opposite result in State v. Huffman , 274 Or.App. 308, 360 P.3d 707 (2015), rev. den. , 358 Or. 550, 368 P.3d 25 (2016). That case involved an extension of a lawful traffic stop that occurred in a "high drug-activity area." Id. at 313, 360 P.3d 707. When pulled over, the defendant immediately got out of his car and began walking to the patrol car. Id. at 309, 360 P.3d 707. He got back into his car at the officer's direction, but he was very nervous and visibly shaking. Id. at 310, 360 P.3d 707. During the stop itself, *454 the defendant "was fidgety, and he made furtive movements with his hands towards the front pocket of his sweatshirt." Id. In response, the officer kept instructing the defendant to place his hands back on the steering wheel. The officer learned from dispatch that the defendant's license was suspended and he was on probation for possessing heroin. At that point, the officer suspected that the defendant was involved in criminal activity, "maybe drugs," and he started an investigation. Id.
We held that all of those circumstances taken together gave the officer reasonable suspicion to investigate. Id. at 315, 360 P.3d 707. In doing so, we particularly noted that the defendant had been driving in an area "associated with a high level of drug activity" and that the stopping officer had testified that, in his training and experience, the defendant's conduct in leaving his car immediately after the stop *330 was unusual and often meant that a suspect was trying to distract him from something in the car or flee the scene. Id. at 313, 360 P.3d 707. In those circumstances, we explained, the defendant's extreme nervousness contributed to the reasonable-suspicion analysis. That is, although there is nothing inherently suspicious about a person being nervous when pulled over, this defendant's "distracting conduct in leaving the car provided [the officer] with an indication of why he might be nervous-that he was trying to hide something." Id. at 314, 360 P.3d 707. We also noted the defendant's previous conviction for possession of heroin and the furtive movements he made toward his sweatshirt pocket, which led the officer to suspect that he had something in the pocket. Id. at 314-15, 360 P.3d 707. In holding that those circumstances collectively gave rise to reasonable suspicion, we emphasized that none of the factors would do so individually. Id. at 315, 360 P.3d 707.
The fundamental distinction between Reich and Huffman is the presence, in Huffman , of facts connecting the defendant to illegal drug activity, which were absent in Reich . Thus, Reich is emblematic of the many cases in which we have held that a defendant's nervousness, after being stopped by police, and the defendant's association with other people involved with drugs does not give rise to objectively reasonable suspicion that the defendant unlawfully possesses controlled substances. See, e.g. , State v. Sherman , 274 Or.App. 764, 362 P.3d 720 (2015) (presence of a butane torch in the vehicle in which the defendant was a passenger, together with signs that the driver had at some point in the past used methamphetamine, did not give rise to reasonable suspicion that the defendant then possessed methamphetamine). We also have held that a person's implausible story of how he or she comes to be in a particular place does not, even in combination with those types of circumstances and signs of being under the influence of narcotics, give rise to reasonable suspicion of drug possession. State v. Davis , 286 Or.App. 528, 400 P.3d 994 (2017) (no reasonable suspicion based on the defendant's presence in a place known for drug deals, his nervousness, his suspicious explanation of his travel route, his apparent methamphetamine intoxication, and movements inconsistent with police commands).
*331 Conversely, Huffman can be grouped with those cases in which the record includes evidence tying the defendant to activity or behavior specifically connected with present drug possession. For example, in State v. McHaffie , 271 Or.App. 379, 350 P.3d 600 (2015), we concluded that an officer reasonably suspected the defendant, a passenger in a car, of possessing drugs where, in addition to such things as exhibiting extreme nervousness, the defendant-who had been involved with methamphetamine use in the past-"was engaged in 'indexing,' which was associated with possession of contraband," and he moved in a way that suggested he was under the influence. Id. at 385, 350 P.3d 600. And in subsequent cases distinguishing McHaffie , we have emphasized the importance to our analysis in that case of the evidence about how the defendant's indexing movements indicated drug possession. See Davis , 286 Or.App. at 536, 400 P.3d 994 (distinguishing McHaffie largely on that point); Sherman , 274 Or.App. at 776, 362 P.3d 720 (similar).
That focus on whether the facts known to an officer include actions, appearances, or behaviors specifically associated *455 with unlawful drug possession is particularly important in light of Maciel-Figueroa . In that case, the Supreme Court emphasized that it is not enough to ask whether an officer had reasonable suspicion of criminal activity in general. Instead, the question must be whether the officer had reasonable suspicion of a specific crime or type of crime. 361 Or. at 180, 389 P.3d 1121. Thus, an officer conducting an investigatory stop for illegal drug possession must be able to "point to specific and articulable facts that give rise to a reasonable inference that the defendant committed or was about to commit" that crime. Id. at 165, 389 P.3d 1121.
In this case, the record does not reflect that Barden was aware of facts giving rise to reasonable suspicion that defendant possessed illegal drugs. Defendant's nervousness, his delay in stopping his vehicle, his odd story about where he was traveling, and his movements and glances toward the central console may all have led Barden to reasonably suspect that defendant was trying to hide something . But without some facts tying defendant specifically to present illegal drug activity, those circumstances do not give rise to reasonable suspicion of unlawful possession of controlled *332 substances. The fact that defendant was driving a car that belonged to his girlfriend, who had some unspecified involvement in illegal drugs, is not enough to provide that link.
We therefore turn to the state's argument that Barden reasonably suspected that defendant was in unlawful possession of a weapon. In that regard, the state contends that the circumstances described above-in combination with defendant's felon status-gave Barden reasonable suspicion of that crime. For the purposes of evaluating the state's argument, we assume, without deciding, that the facts known to Barden could give rise to reasonable suspicion that defendant possessed a weapon. Even with that assumption, however, the state's argument still fails because the record in this case would not support a finding that Barden was aware that defendant was a felon (or that Barden was aware of facts that reasonably suggested to him any other reason defendant's possession of a weapon would be unlawful) before he extended the traffic stop. As noted, Barden testified only briefly on that point, saying that he learned from Chambers that defendant had a felony conviction. But the record includes no evidence supporting an inference that Barden received that information early in the encounter, before he "recontacted" defendant and, shortly thereafter, ordered him out of his vehicle. Significantly, Barden testified that, during a conversation he had with Chambers before that point, Chambers told him about defendant's odd travel story and informed Barden that defendant was driving his girlfriend's vehicle. When asked whether he and Chambers discussed anything else, Barden answered, "No, I don't believe we did at that point." Barden then testified about recontacting defendant, questioning him about possible illegal activity, ordering him out of the vehicle, and bringing him back to the patrol car. Barden then stated that, at some unidentified point "[e]arlier on in the stop," Chambers had told him that defendant was a convicted felon. Nothing in that testimony (and nothing else in the record) suggests whether Chambers gave Barden that information before or after Barden started his criminal investigation and ordered defendant out of the vehicle.
Because this record does not reflect when Barden learned that defendant was a convicted felon, defendant's *333 felon status cannot be considered in the reasonable-suspicion analysis. See State v. Worthington , 265 Or.App. 368, 371, 335 P.3d 348 (2014), rev. den. , 356 Or. 837, 346 P.3d 496, rev. den. , 357 Or. 300, 353 P.3d 595 (2015) ("Only those facts available before the stop are considered to evaluate whether the officer's suspicion was reasonable."). That missing piece of evidence is fatal to the state's argument. As discussed previously, the other circumstances to which the state points may have given Barden reasonable suspicion that defendant was trying to hide something , but without evidence specifically related to the crime of felon in possession of a restricted weapon (or another crime of that type), the circumstances did not give rise to reasonable suspicion of a weapon crime.[2] *456 Finally, the state argues that, even if Barden lacked reasonable suspicion that defendant was engaged in any crime, the trial court correctly denied defendant's suppression motion "because there was not a sufficient causal connection between any illegal extension of the traffic stop and discovery of the switchblade knife." The state points out that the knife became visible when defendant got out of his vehicle, and it argues that Barden would have ordered defendant out of the vehicle in any event, because his license was suspended.
We decline to affirm the judgment on the basis of that argument, which is not one that the state presented to the trial court. In our view, the record could have developed differently had the state argued below that, in any event, defendant inevitably would have had to get out of his truck-and in a way that revealed the knife to an officer-while the officers were still present. That possibility precludes us from affirming on a "right for the wrong reason" basis. Outdoor Media Dimensions Inc. v. State of Oregon , 331 Or. 634, 659-60, 20 P.3d 180 (2001) ; see also State v. Mullens , 276 Or.App. 217, 219, 366 P.3d 798 (2016) ) ("[A]s we have previously *334 held, * * * we will not consider the state's lack-of-exploitation argument as an alternative basis for affirmance where that argument was not made below and the record may have developed differently had it been raised."). Finally, we conclude that the evidence that defendant sought to suppress was essential to his convictions, and the error in denying the suppression motion was, therefore, not harmless.
Reversed and remanded.

Barden was the only witness at the suppression hearing. Barden testified that Chambers told him about the knife "at some point during that contact" between Barden, Chambers, and defendant. When Barden gave that testimony, he had already described bringing defendant back to his patrol car and one of the officers having asked that a narcotics-detection dog be brought to the scene. Barden said that it was "[a]t some point during that whole transaction" that Chambers told him about the knife. Barden also testified that he could not see the knife himself until defendant got out of his vehicle.

We also observe that Barden's testimony about why he believed he had reasonable suspicion to conduct an investigatory stop did not include any mention of defendant's felon status. Thus, we question whether the record would support even a determination that Barden subjectively believed he had justification for investigating defendant for being a felon unlawfully in possession of a weapon. See State v. Tapp , 284 Or.App. 583, 588, 393 P.3d 262 (2017) (questioning whether an officer subjectively believed that the defendant in that case might be involved in a specific crime "as distinct from criminal activity generally").