SHORR, J.
*532 *890 Defendant appeals a judgment of conviction for possession of a loaded firearm in a public place, Portland City Code (PCC) 14A.60.010.[1] On appeal, defendant assigns error to the trial court's denial of his motion to suppress evidence found by a police officer after he stopped and searched defendant without a warrant. Defendant contends that the trial court erred when it concluded that the officer had reasonable suspicion to stop defendant and that the search was justified under the officer-safety exception to the Article I, section 9, warrant requirement of the Oregon Constitution. We conclude that, under the totality of the circumstances, the officer had an objectively reasonable suspicion that defendant had discarded a firearm in the immediate vicinity to sufficiently support an investigatory stop. Further, we conclude that officer-safety concerns justified seizing defendant, patting him down, and handcuffing and securing him in the back of a police car while the officer searched the area where the officer believed that defendant had recently discarded a firearm. Accordingly, we conclude that the trial court did not err when it denied defendant's motion to suppress.
I. FACTS AND PROCEDURAL HISTORY
We begin with the factual standard of review applicable on appeal from a decision on a motion to suppress evidence. We are bound by the trial court's findings of historical fact if they are supported by constitutionally sufficient evidence. State v. Vasquez-Villagomez , 346 Or. 12, 23, 203 P.3d 193 (2009). Further, "[i]n the absence of express factual findings, we presume that the trial court decided the disputed facts in keeping with its ultimate conclusion." State v. Garcia , 276 Or. App. 838, 839, 370 P.3d 512 (2016). With that standard in mind, we recite the following facts.
*891 Portland Police Officers Hughes and Ables were responding to an anonymous tip regarding a gathering of "Crip gang members" at Pier Park in Portland. The officers were both part of the Portland Police Bureau's gang-enforcement team, and were specially trained to "enforce firearm and other related laws related to gang activity." When the officers arrived at the park, they saw several cars leaving the area. One, a Buick, failed to completely stop at a stop sign. Based on that infraction, Hughes and Ables began to follow the Buick in their police car to conduct a traffic stop. The officers briefly lost sight of the Buick after it turned down another street. As the officers drove down that street, Hughes, who was in the passenger seat, spotted the Buick parked on the street. Ables, who was driving the police car, drove past the Buick and then turned around and drove back to where the Buick was parked.
The moment the officers reached the Buick, Ables saw the passenger, defendant in this case, run from the Buick up the driveway of the house in front of which the Buick was parked. The driveway was dark and ended at a fence, beyond which was a side *533 yard adjacent to the house. Hughes got out of the car and walked toward the driveway while Ables engaged with the driver of the Buick. Ables shined the patrol car's spotlight down the driveway, which illuminated the driveway and allowed Hughes to recognize defendant. As Hughes approached the driveway, he saw defendant, who had just run up the driveway, casually walk back down the driveway toward Hughes. Based on prior contacts with defendant in Hughes's capacity as a member of the gang-enforcement team, Hughes recognized defendant as a documented "gang member."[2] Hughes also knew that defendant had been shot several times in the past in connection with gang activities. Based on his experience investigating gang activities, Hughes was aware that individuals associated with violent criminal gangs frequently carried weapons, including "firearms, knives, [and] brass knuckles," *892 and that such individuals who had been shot in the past were even more likely to be armed.
Based on his personal observations of defendant's behavior and his training and experience, Hughes found it suspicious that defendant had fled up the driveway only to return a moment later and suspected that defendant had disposed of a firearm, or perhaps other contraband, at the end of the driveway. To investigate that suspicion, Hughes decided to stop and question defendant. Hughes ordered defendant to put his hands on his head. Defendant held his hands out at his side but kept coming toward Hughes and repeatedly told Hughes that he was "scared" and "wanted to leave." Defendant attempted to walk around Hughes, but Hughes grabbed defendant's arms and put defendant's hands on his head. Defendant attempted to pull his hands apart and struggled with Hughes for approximately 30 seconds, at which point Hughes pinned defendant against the Buick, handcuffed him, and frisked him for weapons.
Hughes did not find any weapons on defendant as a result of the frisk, but he remained concerned that defendant had discarded a firearm within a short distance of the officers. Concerned for officer safety, Hughes placed defendant in the back of the police car, read him his Miranda rights, and questioned him about why he had run up the driveway when the police arrived. Defendant explained that he had discarded a gun by the fence at the end of the driveway. Hughes went to search the end of the driveway and left defendant handcuffed in the police car. Hughes quickly found a loaded handgun by the fence in the area indicated by defendant. Hughes confirmed that the gun belonged to defendant and then arrested defendant for carrying the gun without the requisite permit.
The state charged defendant with unlawful possession of a concealed firearm, ORS 166.250(1)(a) ; unlawful possession of a firearm concealed and readily accessible in a vehicle, ORS 166.250(1)(b) ; and unlawful possession of a loaded firearm in a public place, PCC 14A.60.010. Before trial, defendant moved to suppress the handgun as evidence. At the suppression hearing, the trial court denied defendant's motion from the bench. The court concluded that *893 Hughes had reasonable suspicion to stop defendant based on Hughes's training and experience with gang members and defendant's "highly unusual behavior" immediately preceding his encounter with Hughes. The court then concluded that officer-safety concerns justified Hughes's decision to frisk defendant, and Hughes's fear that defendant had discarded a firearm in the area justified his decision to temporarily handcuff and detain defendant in the back of the police car. The case proceeded to trial, at which defendant was convicted of unlawful possession of a loaded firearm in a public place and acquitted of the other charges.
On appeal, defendant argues that the trial court erred in denying his suppression motion. Defendant reiterates his arguments raised at the suppression hearing, namely that Hughes lacked reasonable suspicion to stop defendant because there was no evidence that defendant had committed or was *534 committing a crime; and, even if there was reasonable suspicion to stop defendant, there was no objectively reasonable officer-safety justification for Hughes to frisk or handcuff and detain defendant.
II. ANALYSIS
We review the trial court's decision to deny defendant's suppression motion for legal error. Vasquez-Villagomez , 346 Or. at 23, 203 P.3d 193. As noted, we are bound by the trial court's findings of facts if there is constitutionally sufficient evidence to support them. Id.
A. Reasonable Suspicion for Initial Investigatory Stop
First, we consider whether Hughes had reasonable suspicion that defendant had unlawfully possessed a firearm to justify the investigatory stop. "For police officers to make a stop, they must reasonably suspect-based on specific and articulable facts-that the person committed a specific crime or type of crime or was about to commit a specific crime or type of crime." State v. Maciel-Figueroa , 361 Or. 163, 182, 389 P.3d 1121 (2017). Mere suspicion that the person is engaged in some kind of general criminal activity at the time of the stop is insufficient because, "[w]hen an officer's suspicion reduces to that level of generality, such a rule would permit an officer to stop an individual whenever *894 the officer believes that the person appears to be a criminal or that something about a situation seems 'criminal.' " Id. at 181, 389 P.3d 1121. Our review of a stop is "based on the record made concerning the officer's actual belief that the defendant may have committed a crime," as well as "the specific facts, articulated by the officer, that led him or her to believe that the defendant may have committed a crime, which we then review as a matter of law for objective reasonableness." Id. at 183, 389 P.3d 1121. Finally,
"the state need not prove that the articulated facts give rise to a conclusion with certainty that a crime has occurred or is about to occur; instead, based on the specific facts known and articulated by the officer, a reviewing court must conclude that the officer's subjective belief could be true, as a matter of logic."
Id. at 184, 389 P.3d 1121 (emphasis in original).
With those principles in mind, we briefly reiterate the facts in this case that caused Hughes to suspect that defendant likely discarded a firearm at the end of the driveway: Ables and Hughes were in the area responding to a tip regarding a gathering of gang members at Pier Park in Portland. When they arrived, the officers saw a Buick quickly leave the area and run a stop sign. The officers followed the Buick in an effort to conduct a traffic stop. The Buick quickly turned down another street and parked on the street in front of a house. The officers drove past the Buick without seeing it before realizing their mistake and doubling back to where the Buick was parked. When the officers reached the Buick, Ables saw defendant, who was about to be approached by the police, run from the passenger side of the car to the end of the darkened driveway of the house. Ables told Hughes what he had seen. Ables then shined the patrol car's spotlight onto the Buick, which illuminated the driveway as well. Hughes recognized the driver, who remained in the car, as a known gang member. After only a moment, defendant walked slowly back down the driveway and toward the officers on the street. Hughes had gotten out of the police car at that point, observed defendant's behavior, and also recognized defendant as a known gang member who had been shot several times in the past.
*895 Hughes testified that, based on his training and experience, he knew that people in defendant's position frequently carry guns for self-protection.
In addition, Hughes found it suspicious that defendant would flee a short distance into a darkened area and then immediately return to the officers at the end of the driveway. Hughes had not ordered defendant to return, and there was no immediately apparent reason for defendant to do so. In Hughes's experience, suspects who flee from the police rarely begin to flee and then abruptly and calmly turn back and engage with the police. One likely explanation for that behavior, in Hughes's mind, was that *535 defendant wanted to dispose of a firearm so that the officers would not find it if they searched him.
Finally, Hughes testified that, in his experience, suspects do not attempt to secretly discard items that they are legally permitted to possess before engaging with the police. The fact that Hughes suspected that defendant had disposed of a firearm at the end of the driveway led logically to an inference that defendant was not permitted to possess that weapon.
Hughes's observations led to his subjective suspicion that defendant had discarded an illegally possessed firearm at the end of the driveway. Standing alone, each of the circumstances known or observed by Hughes may not be sufficient to give rise to the officer's reasonable suspicion. Under the totality of the circumstances just described, however, we conclude that Hughes's suspicion was objectively reasonable.
Hughes's testimony demonstrates that his suspicion that defendant had committed a particular type of crime-one involving unlawful possession of a firearm-was based on more than a mere hunch, and more than his awareness that gang members typically carry guns, especially when they have been shot in the past. Rather, it was defendant's gang affiliation and history as a gunshot victim, combined with Hughes's personal observations of defendant's unusual and suspicious behavior, that led Hughes to suspect that defendant discarded an illegally possessed firearm nearby. Compare *896 State v. Huffman , 274 Or. App. 308, 360 P.3d 707 (2015), rev. den. , 358 Or. 550, 368 P.3d 25 (2016) (finding reasonable suspicion that the defendant was involved in illegal drug activity during a traffic stop where the stop was in a "high drug-activity area"; the defendant got out of his car after he was pulled over, which, based on the officer's training and experience, indicated that he was trying to distract the officer from something in the car; the defendant seemed nervous, which further suggested that he was trying to hide something, and made furtive movements toward his sweatshirt pocket; and the officer became aware that the defendant was on probation for possession of heroin, which was a status that supported the officer's suspicion when considered in light of the other circumstances), with State v. Decker , 290 Or. App. 321, 417 P.3d 449 (2018) (finding a lack of reasonable suspicion that defendant was involved in illegal drug activity or unlawfully possessed a weapon during a traffic stop where the defendant pulled over very slowly, seemed nervous, continually glanced away from the officer to the center console of the car, and told the officer an "odd story" about where he was driving, and the car belonged to his girlfriend who was known to be involved with illegal drugs).
In a recent case, Decker , we concluded that an officer may have reasonably suspected, based on the totality of the circumstances, that the defendant was "trying to hide something " during a traffic stop, but the officer lacked evidence "specifically related" to the crimes that the officer prolonged the stop to investigate-illegal possession of a controlled substance or felon in possession of a restricted weapon-"or another crime of that type." 290 Or. App. at 331, 333 (emphasis in original). We concluded that the officer's more generalized suspicion fell short of reasonable suspicion "based on specific and articulable facts" that the person committed a "specific crime or type of crime" required by Maciel-Figueroa , 361 Or. at 182, 389 P.3d 1121. Decker , 290 Or. App. at 331, 417 P.3d 449. We also noted in Decker that the factual record in that case would not support a finding that the officer was aware of facts that reasonably suggested a "reason defendant's possession of a weapon would be unlawful." Id. at 332, 417 P.3d 449. Here, by contrast, the circumstances reasonably led Hughes to suspect that defendant had committed a specific "type of crime"-one involving unlawful possession of a firearm. The record does *897 not reflect that Hughes specifically suspected defendant of violating PCC 14A.60.010, which generally prohibits possession of a loaded and concealed firearm in a public place. But, as explained above, there is sufficient evidence that Hughes reasonably suspected that defendant had committed a "type of crime" involving the unlawful possession of a firearm prior to stopping defendant to investigate that suspicion. *536 B. Reasonable Suspicion for Officer-Safety Detention and Search
Having determined that Hughes initially stopped defendant based on his objectively reasonable suspicion that defendant illegally possessed and discarded a firearm, we turn to whether the officer-safety exception to the Article I, section 9, warrant requirement justified Hughes's decision to detain defendant, pat him down, and handcuff him in the back of the police car while Hughes searched the area.
Under the officer-safety exception to the Article I, section 9, warrant requirement, a police officer may take "reasonable steps" to protect himself or herself if, "during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present." State v. Bates , 304 Or. 519, 524, 747 P.2d 991 (1987). To satisfy that standard, "an officer's safety concerns must be based on facts specific to the particular person searched, not on intuition or a generalized fear that the person may pose a threat to the officer's safety." State v. Miglavs , 186 Or. App. 420, 425, 63 P.3d 1202 (2003), aff'd , 337 Or. 1, 90 P.3d 607 (2004).
With the foregoing standard in mind, we conclude that, under the totality of the circumstances, it was reasonable for Hughes to detain and search defendant. Hughes encountered defendant at night. A large gathering of gang members had recently broken up a short distance away. Although Hughes and Ables were not alone or outnumbered, both defendant and his companion, also a known gang member, were unsecured, and both officers were aware that other gang members could be nearby. Defendant showed his *898 hands at Hughes's request, but he did not place his hands on his head when ordered to do so and he tried to walk around Hughes. At that point, Hughes grabbed defendant's arms in an effort to stop him, but defendant pulled his hands apart and pulled away from Hughes, which Hughes perceived as an attempt to resist his efforts to control defendant's hands. Hughes and defendant struggled for approximately 30 seconds before Hughes managed to pin defendant against the Buick and handcuff him. As previously noted, Hughes knew that defendant was a member of a local gang and that defendant had been shot in the past. Based on Hughes's training and experience, he knew that gang members frequently carried guns and that gang members who had been shot were more likely to be armed. Finally, Hughes reasonably suspected that defendant might have had access to an unsecured firearm that he suspected defendant had discarded a short distance away and that defendant might have other concealed weapons on his person.
In our prior cases construing the officer-safety exception, we have cautioned that an officer's "perceptions of the stereotypical practices of [gang] members is the kind of generalized suspicion that seldom will constitute a reasonable suspicion based on particularized facts." State v. Redmond , 114 Or. App. 197, 201, 834 P.2d 516 (1992). But we also afford officers "considerable latitude" to take safety precautions when they develop a reasonable suspicion, based on specific and articulable facts, that a suspect poses an immediate threat to officer safety. Bates , 304 Or. at 524, 747 P.2d 991. To that end, when an officer's generalized knowledge of gang practices supplements his or her observation of a defendant's specific and particularized behavior to give rise to safety concerns, we have frequently upheld a subsequent officer-safety search. See, e.g. , State v. Pope , 150 Or. App. 457, 462-63, 946 P.2d 1157 (1997), rev. den. , 327 Or. 521, 971 P.2d 408 (1998) (officer-safety search was justified where the officer believed the defendant was a member of a violent gang, the officer had knowledge of and experience with gang practices, the defendant stated that he was armed with a knife, and the defendant behaved in an unusual manner when the officer first encountered him); Redmond , 114 Or. App. at 201, 834 P.2d 516 (officer-safety search was *899 justified where the officer saw that the defendant was wearing gang-affiliated clothing and accessories, had training related to gang activities, and saw that the defendant was armed with a knife). Here, Hughes's officer-safety concerns were based on more *537 than defendant's gang affiliation and Hughes's general knowledge about gang members. Rather, the time, setting, extenuating circumstances, and Hughes's personal observations of defendant's suspicious and uncooperative behavior all contributed to Hughes's concern for officer safety. See Miglavs , 337 Or. at 13, 90 P.3d 607 (under the totality of the circumstances, officer had reasonable suspicion that the defendant posed an officer-safety threat where the defendant had been uncooperative and behaving in a suspicious manner during a late-night stop and his clothing demonstrated his affiliation with a local gang that frequented the area).
In addition, Hughes's suspicion that defendant had discarded a firearm nearby magnified his safety concerns. We have previously concluded that officer-safety concerns were reasonable when there was evidence that a defendant was armed or had access to weapons that were not secured at the time of the search. In State v. Wiggins , 184 Or. App. 333, 338-39, 56 P.3d 436 (2002), for example, we determined that an officer-safety search was reasonable where the defendant was a passenger in a motor home, the officer knew the driver and knew that he owned upwards of 100 firearms, and the officer believed that any weapons owned by the driver would be unsecured somewhere inside the motorhome. Similarly, in City of Portland v. Weigel , 276 Or. App. 342, 344-45, 367 P.3d 541 (2016), we upheld an officer-safety search where the officers could see that the defendant was armed with a pistol and had access to a baseball bat a few feet away. See also Redmond , 114 Or. App. at 201, 834 P.2d 516 (officer-safety search justified where the officer reasonably believed that the defendant was a member of a violent gang, the officer could see that the defendant was armed with a knife, and the officer suspected that the defendant might have access to other unsecured weapons). Cf. State v. Smith , 277 Or. App. 298, 309, 373 P.3d 1089, rev. den. , 360 Or. 401, 381 P.3d 844 (2016) (concluding that an officer-safety search was unreasonable, in part, because "[t]his is also not a case where there was evidence that defendant was armed or had access to weapons that were not secured at the time of the search"). Accordingly, the fact that Hughes suspected that there was an unsecured firearm only a short distance away provided an additional justification for Hughes to detain and search defendant on officer-safety grounds.
Nor was it unreasonable for Hughes to briefly handcuff defendant and detain him in the back of the police car after the frisk revealed that defendant was not armed. Police officers may temporarily handcuff a suspect during an investigatory stop without converting the stop into an arrest. Weigel , 276 Or. App. at 345, 367 P.3d 541 ("[W]e are persuaded that securing defendant's hands with handcuffs was a reasonable precautionary measure to take in order to guard against the possibility of defendant accessing and discharging his weapon during the course of the investigatory stop."); State v. Hebrard , 244 Or. App. 593, 598, 260 P.3d 759 (2011) ("An officer confronted with safety concerns may handcuff a person without converting the stop into an arrest[.]"). However, "the stop is converted into an arrest if the officer continues to use force to restrain the [suspect] after the officer's safety concerns have dissipated." Hebrard , 244 Or. App. at 598, 260 P.3d 759. Often, an officer's safety concerns will dissipate if a frisk reveals that the suspect is not armed. In this case, however, Hughes's immediate concern for officer safety did not dissipate once he frisked defendant and discovered that defendant was not armed. The investigatory stop was predicated, in part, upon Hughes's reasonable concern that defendant had discarded a firearm nearby and a fear that defendant could easily run back to the gun at a moment's notice. In addition, defendant struggled with Hughes and was generally uncooperative when Hughes attempted to stop him. Allowing defendant to go free before Hughes had the chance to determine whether there was, in fact, a firearm that defendant could access in the immediate area would not have reasonably alleviated Hughes's officer-safety concerns. Accordingly, Hughes's officer-safety concerns justified his decision to temporarily handcuff and secure defendant in the back of the police car during his search of the immediate area where he suspected defendant may have thrown a gun.
*538 III. CONCLUSION
We conclude, first, that Hughes had reasonable suspicion to stop defendant for the purpose of investigating whether defendant discarded a firearm at the end of the driveway. Second, we conclude that the officer-safety exception to the Article I, section 9, warrant requirement justified Hughes's decision to seize defendant, frisk him, and handcuff and secure him in the back of the police car while Hughes determined whether there was an unsecured firearm accessible in the immediate vicinity. Accordingly, the trial court did not err when it denied defendant's motion to suppress evidence found as a result of that encounter.
Affirmed.

PCC 14A.60.010 provides, in relevant part:
"A. It is unlawful for any person to knowingly possess or carry a firearm, in or upon a public place, including while in a vehicle in a public place, recklessly having failed to remove all the ammunition from the firearm.
"B. It is unlawful for any person to knowingly possess or carry a firearm and that firearm's clip or magazine, in or upon a public place, including while in a vehicle in a public place, recklessly having failed to remove all the ammunition from the clip or magazine."

The Portland Police Bureau rescinded its policy of documenting people as gang members on October 15, 2017, after the events of this case took place. According to Hughes, the gang-enforcement team designated gang members based on either an admission that a person belongs to a gang or "through social network or tattoos or knowledge of gang history."